UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
AUG 08 2008
JUDGMENT CLERK'S
OFFICE

DB STRUCTURED PRODUCTS, INC.

Plaintiff,

-against-

IMPERIAL LENDING LLC

Defendant.

**ECF CASE**

07 Civ. 4105 (GBD)

AFFIDAVIT OF JOHN P. DOHERTY IN
SUPPORT OF DEFAULT JUDGMENT

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss.: |
| COUNTY OF NEW YORK | ) |

John P. Doherty, being duly sworn, deposes and says:

1.      I am a member of the bar of this Court and a member of THACHER PROFFITT &
WOOD LLP, attorneys for Plaintiff, DB Structured Products, Inc. ("Plaintiff") in the above-
captioned matter.

2.      I submit this affidavit pursuant to Rule 55.2(b) of the Civil Rules for the Southern
District of New York in support of Plaintiff's application for a Default Judgment against Imperial
Lending LLC ("Defendant").

3.      On May 25, 2007, the above-captioned action ("Action") was commenced with the
filing of the Complaint. A true and correct copy of the Summons and Complaint are attached hereto
as Exhibit A.

4.      On June 5, 2007, a copy of the Summons and Complaint was properly served on
Defendant by personally serving Defendant's registered agent, Herrick R. Lidstone, Jr. Proof of

such service was filed with the Clerk on June 13, 2007. A true and correct copy of such proof of service is attached hereto as Exhibit B.

5.     The Parties had previously entered into stipulations, so-ordered by the Court, extending the time by which Defendant was required to answer or otherwise move against the Complaint. The last such stipulation so-ordered by the Court was entered by the Court on September 25, 2007 and provided that Defendant's time to answer or otherwise move against the Complaint was extended to and including October 26, 2007.

6.     The time within which Defendant was permitted to file an answer to the Complaint or otherwise move has now expired.

7.     Defendant has failed to plead or otherwise defend this Action.

8.     On August 7, 2008, the Clerk of the Court entered a Certificate of Default against the Defendant. The Certificate of Default is attached hereto as Exhibit C.

9.     As more fully set forth in the Complaint attached hereto as Exhibit A, the Plaintiff's claim is contractual in nature inasmuch as damages sought in the Complaint arise from Defendant's breach of its duties and obligations under a Master Mortgage Loan Purchase and Interim Servicing Agreement ("Agreement") entered into between Plaintiff and Defendant on or about September 1, 2005. Damages to be awarded Plaintiff pursuant to a default judgment can be readily determined by reference to the Agreement and other exhibits to the Complaint. As of August 8, 2008 such damages currently amount to $2,584,270.63, as more fully set forth in the Statement of Damages, attached hereto as Exhibit D.

10.     Within thirty (30) days following payment in full of the amount awarded by the Default Judgment, Plaintiff shall return to Defendant the Mortgage Loans[1] as set forth in the Agreement.

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Complaint.

WHEREFORE, Plaintiff requests the Judgment, attached hereto as Exhibit E, be entered against defendant.

By: _____
JOHN P. DOHERTY

Sworn to before me this
7th day of August 2008

_____
Notary Public

CHRISTOPHER A. LYNCH
Notary Public, State of New York
No. 02LY6151597
Qualified in Queens County
Commission Expires Aug. 21, 2010

3

# EXHIBIT A

AO 440 (Rev. 10/93) Summons in a Civil Action - SDNY WEB 4/99

# United States District Court

SOUTHERN          DISTRICT OF          NEW YORK

DB STRUCTURED PRODUCTS, INC.

**SUMMONS IN A CIVIL CASE**

V.

CASE NUMBER:

IMPERIAL LENDING LLC

# 07 CV 4105

TO: (Name and address of defendant)

IMPERIAL LENDING LLC
425 North Wilcox Street
Castle Rock, CO 80104

YOU ARE HEREBY SUMMONED and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

THACHER PROFFITT & WOOD LLP
Richard F. Hans (RH-0110)
John P. Doherty (JD-3275)

Two World Financial Center
New York, New York 10281
(212) 912-7400

an answer to the complaint which is herewith served upon you, within _____ TWENTY _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

MAY 2 5 2007

CLERK

DATE

(BY) DEPUTY CLERK

AO 440 (Rev. 10/93) Summons in a Civil Action -SDNY  WEB 4/99

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and Complaint was made by me[1] | |
| NAME OF SERVER (PRINT) | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

☐ Other (specify): _____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
                     Date                              Signature of Server

                                                      _____
                                                      Address of Server

(1)  As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

07 CV 4105

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DB STRUCTURED PRODUCTS, INC.

                                Plaintiff,                    Civ. No.

              -against-

IMPERIAL LENDING LLC                                          **COMPLAINT**

                                Defendant.

MAY 25 2007

CASHIERS

Plaintiff DB Structured Products, Inc. ("DBSP" or "Plaintiff"), by its attorneys, Thacher Proffitt & Wood LLP, for its complaint against defendant Imperial Lending LLC ("Defendant") (collectively, the "Parties") alleges as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

2.    Venue is proper pursuant to 28 U.S.C. § 1391(a).

## THE PARTIES

3.    Plaintiff DBSP is a corporation organized and existing under the laws of the State of Delaware. DBSP maintains its principal place of business at 60 Wall Street, New York, New York.

4.    Upon information and belief, Defendant is a limited liability company organized and existing under the laws of the State of Colorado, and maintains its principal place of business at 425 North Wilcox Street, Castle Rock, CO.

## FACTUAL ALLEGATIONS

### The Master Mortgage Loan Purchase and Interim Servicing Agreement

5.    On or about September 1, 2005, DBSP and Defendant entered into a Master Mortgage Loan Purchase and Interim Servicing Agreement, as thereafter amended and restated (the "Purchase Agreement"). A copy of the Purchase Agreement is attached hereto as Exhibit 1. Exhibit 1 is hereby incorporated herein as if fully set forth.

6.    As set forth in Section 22 of the Purchase Agreement, the Parties agreed that the Purchase Agreement "shall be construed in accordance with the laws of the State of New York without regard to any conflicts of law provisions and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York . . ."

7.    In connection with individual transactions between the Parties pursuant to the Purchase Agreement, DBSP and Defendant also entered into multiple letter agreements, including, but not limited to, those dated November 7, 2005, December 6, 2005, December 20, 2005, January 4, 2006, February 3, 2006, and February 17, 2006 (collectively, the "Letter Agreements," and together with the Purchase Agreement, the "Agreements").

8.    The Letter Agreements state that they "shall be governed in accordance with the laws of the state of New York, without regard to conflict of laws rules."

### Defendant's Failure to Repurchase
### Loans With Early Payment Defaults From DBSP

9.    Pursuant to the Agreements, Defendant from time to time offered to sell and DBSP agreed to purchase certain mortgage loans ("Mortgage Loans") in accordance with the terms of the Agreements.

2

10.    Pursuant to Section 7.05 of the Purchase Agreement and Section 2(c) of the Letter Agreements, in connection with the Mortgage Loan sales, Defendant agreed to repurchase all Mortgage Loans in early payment default as detailed under the Agreements.

11.    Certain of the Mortgage Loans experienced early payment defaults, as described in Section 7.05 of the Purchase Agreement and Section 2(c) of the Letter Agreements (hereafter, such Mortgage Loans shall be collectively referred to as "Early Payment Default Loans.") Attached as Exhibit 2 is a schedule of Early Payment Default Loans, which is hereby incorporated herein as if fully set forth.

12.    Accordingly, pursuant to Section 7.05 of the Purchase Agreement and Section 2(c) of the Letter Agreements, Defendant is obligated to remit to DBSP the Repurchase Price (as defined in the Agreements) with respect to each Early Payment Default Loan.

13.    On April 26, 2007, DBSP issued a written demand to Defendant to repurchase the Early Payment Default Loans for a sum equal to the Repurchase Price on or before May 10, 2007 (the "Demand Letter"). A copy of the Demand Letter is attached hereto as Exhibit 3, which is hereby incorporated herein as if fully set forth.

14.    In addition, prior to DBSP's issuance of the Demand Letter, DBSP also notified Defendant via one or more emails and/or other communications that certain Mortgage Loans, including the Early Payment Default Loans, were in early payment default status. In addition to the Demand Letter, these email notifications separately triggered Defendant's obligations to repurchase such Early Payment Default Loans, pursuant to the Agreements.

15.    To date, Defendant has failed to repurchase the Early Payment Default Loans from DBSP, notwithstanding its clear contractual obligation to do so.

16.    The aggregate Repurchase Price for the Early Payment Default Loans, excluding attorneys' fees and other costs and expenses, exceeds $2,279,145.99.

17.    DBSP has performed all of its obligations under the Agreements.

18.    As a result of Defendant's failure to repurchase the Early Payment Default Loans, DBSP is required to maintain possession and maintenance of the Early Payment Default Loans, and may be exposed to any claims or losses that might be sustained by reason of ownership of each such loan.  Moreover, because the Early Payment Default Loans are in default, DBSP is unable to include certain of the Early Payment Default Loans in securitizations or other packages, a specific purpose, known to Defendant, for which DBSP purchased the Early Payment Default Loans.  Accordingly, DBSP's harm is not solely monetary and cannot be adequately compensated by damages.

**Indemnification**

19.    Pursuant to Section 7.03 of the Purchase Agreement, Defendant agreed to indemnify DBSP for any and all losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments and any other costs, fees and expenses that DBSP may sustain that results from Defendant's breach of a representation or warranty contained within Section 7 of the Purchase Agreement.

20.    Defendant has breached the representations and warranties in Section 7 of the Purchase Agreement that Defendant would repurchase the Early Payment Default Loans from DBSP.  As a result, Defendant owes DBSP indemnification for all losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments and any other costs, fees and expenses that DBSP may sustain.

21.    Pursuant to Section 13.01 of the Purchase Agreement, Defendant agreed to indemnify DBSP for any and all claims, losses, damages, penalties, fines, forfeitures, legal fees

4

and related costs, judgments and any other costs, fees and expenses that DBSP may sustain that are in any way related to the failure of Defendant to perform its obligations under the Purchase Agreement.

22.    Defendant has failed to perform its obligations under the Purchase Agreement, including the obligation to repurchase the Early Payment Default Loans from DBSP. As a result, Defendant owes DBSP indemnification for all losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments and any other costs, fees and expenses that DBSP may sustain.

23.    Pursuant to the Purchase Agreement, Defendant agreed that it will indemnify DBSP and hold it harmless against all court costs, attorneys' fees and any of the other costs, fees and expenses incurred by DBSP in enforcing the Purchase Agreement.

24.    Defendant's indemnification obligations survive the Purchase Date, the termination of the Purchase Agreement and the disqualification or suspension of Defendant.

25.    Defendant's indemnification obligations expressly include the legal fees and related costs and any other costs, fees and expenses DBSP may sustain in connection with Defendant's failure to observe and perform its obligations to repurchase the Early Payment Default Loans, including but not limited to, the attorneys' fees and other expenses incurred by DBSP in this action.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract - Agreements)

26.    Plaintiff DBSP realleges paragraphs 1 through 25 of this complaint as if fully set forth herein.

27.    Under the Agreements, Defendant agreed to repurchase the Early Payment Default Loans from DBSP.

28.    DBSP has demanded that Defendant repurchase the Early Payment Default Loans.

29.    Defendant has refused and failed to repurchase the Early Payment Default Loans.

30.    As a direct, proximate and actual result of Defendant's breach of its obligations to repurchase the Early Payment Default Loans, DBSP has suffered damages in an amount to be determined at trial, but which is not less than $2,279,145.99 as of April 27, 2007, plus interest.

## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment)

31.    Plaintiff DBSP realleges paragraphs 1 through 30 of this complaint as if fully set forth herein.

32.    In consideration of the sale of the Early Payment Default Loans, Defendant received payment from DBSP.

33.    Defendant has wrongfully refused to repurchase the Early Payment Default Loans, causing DBSP to lose the use of those moneys due and owing, and requiring DBSP to incur attorneys' fees to recover these costs due under the Agreements. It would be unjust and inequitable to allow Defendant to benefit in this manner.

34.    By reason of the foregoing, Defendant has been unjustly enriched at the expense of DBSP, and DBSP has suffered damages in an amount to be established at trial.

## THIRD CLAIM FOR RELIEF
### (Indemnification for Legal Fees And Related Costs)

35.    Plaintiff DBSP realleges paragraphs 1 through 34 of this complaint as if fully set forth herein.

36.    Pursuant to Sections 7.03 and 13.01 of the Purchase Agreement, Defendant agreed to indemnify DBSP for any and all claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses that DBSP may

6

sustain that are in any way related to Defendant's breach of Defendant's representations and warranties or Defendant's failure to observe and perform its duties, obligations, and covenants in strict compliance with the terms of the Purchase Agreement.

37.    Defendant has breached its representations and warranties and failed to observe its obligations, causing DBSP to suffer the damages for which Defendant owes indemnity.

38.    Defendant is therefore liable to DBSP for all of DBSP's legal fees and related costs, and all other costs, fees and expenses that DBSP has incurred, is incurring and will incur in connection with Defendant's failure to observe and perform its obligation to repurchase the Early Payment Default Loans.

## FOURTH CLAIM FOR RELIEF
### (Specific Performance)

39.    Plaintiff DBSP realleges paragraphs 1 through 38 of this complaint as if fully set forth herein.

40.    The Agreements are valid, enforceable contracts between Defendant and DBSP.

41.    Under the terms of the Agreements, DBSP and Defendant made several valid and enforceable mutual agreements.

42.    DBSP substantially performed its obligations under the Agreements by, *inter alia*, purchasing Mortgage Loans from Defendant pursuant to the terms and provisions of the Agreements.

43.    DBSP is willing and able to perform its obligations under the Agreements by, including but not limited to, delivering repurchased loans to Defendant.

44.    Upon information and belief, Defendant is able to continue to perform under the Agreements, including but not limited to, repurchasing the Early Payment Default Loans.

45.    DBSP has suffered harm resulting from Defendant's refusal to repurchase the Early Payment Default Loans for which there is no adequate remedy at law.

46.    DBSP has demanded, and is entitled to, specific performance of Defendant's repurchase obligations under the Agreements.

47.    As a result of the foregoing breaches, pursuant to the Agreements, Defendant is obligated to pay DBSP an amount not less than $2,279,145.99 as of April 27, 2007, plus interest.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff DBSP respectfully requests judgment against Defendant as follows:

A.    Damages in an amount to be determined at trial but not less than $2,279,145.99;

B.    Specific performance of the Agreements;

C.    Attorneys' fees and related costs, and all other costs, fees and expenses that DBSP has incurred, is incurring and will incur in this action in connection with Defendant's failure to observe and perform its obligations under the Agreements; and

D.    Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       May 25, 2007

THACHER PROFFITT & WOOD LLP

By: _____

John P. Doherty (JD-3275)
Richard F. Hans (RH-0110)
Kerry Ford Cunningham (KF-1825)
Brendan E. Zahner (BZ-8645)
Two World Financial Center
New York, New York 10281
(212) 912-7400

*Attorneys for DB Structured Products, Inc.*

9

# MASTER MORTGAGE LOAN PURCHASE AND INTERIM SERVICING AGREEMENT

## IMPERIAL LENDING LLC

Seller and Interim Servicer

### DB STRUCTURED PRODUCTS, INC.
### INITIAL PURCHASER

DATED AS OF SEPTEMBER 1, 2005

Fixed and Adjustable Rate Mortgage Loans

FIRST AND SECOND LIENS

## TABLE OF CONTENTS

Page

SECTION 1.  Definitions ........................................................................................1

SECTION 2.  Agreement to Purchase .....................................................................11

SECTION 3.  Mortgage Loan Schedules ................................................................11

SECTION 4.  Purchase Price ...................................................................................11

SECTION 5.  Examination of Mortgage Files; Corporate Due Diligence ...............11

SECTION 6.  Conveyance from Seller to Initial Purchaser ....................................12
    Subsection 6.1.  Conveyance of Mortgage Loans; Possession of Servicing Files ...........12
    Subsection 6.2.  Books and Records ..............................................................12
    Subsection 6.3.  Delivery of Mortgage Loan Documents ..............................13

SECTION 7.  Representations, Warranties and Covenants of the Seller: Remedies for Breach. 13
    Subsection 7.1.  Representations and Warranties Respecting the Seller .........13
    Subsection 7.2.  Representations and Warranties Regarding Individual Mortgage Loans .......16
    Subsection 7.3.  Remedies for Breach of Representations and Warranties .....28

SECTION 8.  Closing ..............................................................................................29

SECTION 9.  Closing Documents ...........................................................................30

SECTION 10. Costs .................................................................................................31

SECTION 11. Seller's Servicing Obligations .........................................................31

SECTION 12. Removal of Mortgage Loans from Inclusion under This Agreement Upon a
    Whole Loan Transfer or a Pass-Through Transfer on One or More Reconstitution
    Dates .................................................................................................35

SECTION 13. The Seller ..........................................................................................36
    Subsection 13.1. Additional Indemnification by the Seller ............................36
    Subsection 13.2. Merger or Consolidation of the Seller .................................36
    Subsection 13.3. Limitation on Liability of the Seller and Others ..................37
    Subsection 13.4. Seller Not to Resign ...........................................................37
    Subsection 13.5. No Transfer of Servicing .....................................................38

SECTION 14. DEFAULT ........................................................................................38
    Subsection 14.1. Events of Default ...............................................................38

-ii-

Subsection 14.2. Waiver of Defaults................................................................................39

SECTION 15. Termination................................................................................................39

SECTION 16. Successor to the Seller..............................................................................40

SECTION 17. Financial Statements..................................................................................41

SECTION 18. Mandatory Delivery; Grant of Security Interest.......................................41

SECTION 19. Notices.......................................................................................................42

SECTION 20. Severability Clause....................................................................................42

SECTION 21. Counterparts...............................................................................................42

SECTION 22. Governing Law...........................................................................................42

SECTION 23. Intention of the Parties..............................................................................43

SECTION 24. Successors and Assigns.............................................................................43

SECTION 25. Commitment Letter....................................................................................44

SECTION 26. Waivers......................................................................................................44

SECTION 27. Exhibits......................................................................................................44

SECTION 28. Nonsolicitation...........................................................................................44

SECTION 29. General Interpretive Principles.................................................................44

SECTION 30. Reproduction of Documents......................................................................45

SECTION 31. Further Agreements....................................................................................45

SECTION 32. Compliance with Regulation AB...............................................................45

-iii-

## EXHIBITS

EXHIBIT 1        FORM OF SELLER'S OFFICER'S CERTIFICATE

EXHIBIT 2        [RESERVED]

EXHIBIT 3        FORM OF SECURITY RELEASE CERTIFICATION

EXHIBIT 4        FORM OF ASSIGNMENT AND CONVEYANCE

EXHIBIT 5        CONTENTS OF EACH MORTGAGE FILE

EXHIBIT 6        [RESERVED]

EXHIBIT 7        [RESERVED]

EXHIBIT 8        [RESERVED]

EXHIBIT 9        FORM OF COMMITMENT LETTER

EXHIBIT 10       MORTGAGE LOAN DOCUMENTS

EXHIBIT 11       FORM OF MONTHLY SERVICER'S REPORT

## MASTER MORTGAGE LOAN PURCHASE AND INTERIM SERVICING AGREEMENT

This is a MASTER MORTGAGE LOAN PURCHASE AND INTERIM SERVICING AGREEMENT (the "Agreement"), dated as of September 1, 2005, by and between DB Structured Products, Inc., having an office at 60 Wall Street, New York, New York 10005 (the "Initial Purchaser", and the Initial Purchaser or the Person, if any, to which the Initial Purchaser has assigned its rights and obligations hereunder as Purchaser with respect to a Mortgage Loan, and each of their respective successors and assigns, the "Purchaser") and Imperial Lending LLC, having an office at 425 North Wilcox Street, Castle Rock, Colorado 80104 (the "Seller").

### WITNESSETH:

WHEREAS, the Seller desires to sell, from time to time, to the Purchaser, and the Purchaser desires to purchase, from time to time, from the Seller, certain conventional fixed and adjustable rate residential first and second lien mortgage loans, (the "Mortgage Loans") as described herein on a servicing-released basis, and which shall be delivered in groups of whole loans or participation interests therein, as applicable, on various dates as provided in the related Commitment Letter (each, a "Closing Date");

WHEREAS, each Mortgage Loan is secured by a mortgage, deed of trust or other security instrument creating a first or second` lien on a residential dwelling located in the jurisdiction indicated on the Mortgage Loan Schedule for the related Mortgage Loan Package, which is to be annexed to the related Assignment and Conveyance on each Closing Date as Schedule One;

WHEREAS, the Purchaser and the Seller wish to prescribe the manner of the conveyance, interim servicing and control of the Mortgage Loans; and

WHEREAS, following its purchase of the Mortgage Loans from the Seller, the Purchaser desires to sell some or all of the Mortgage Loans to one or more purchasers as a whole loan transfer in a whole loan or participation format or a public or private mortgage-backed securities transaction;

NOW, THEREFORE, in consideration of the premises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchaser and the Seller agree as follows:

SECTION 1.   Definitions.   For purposes of this Agreement the following capitalized terms shall have the respective meanings set forth below.

Adjustable Rate Mortgage Loan: A Mortgage Loan which provides for the adjustment of the Mortgage Interest Rate payable in respect thereto.

Adjustment Date: With respect to each Adjustable Rate Mortgage Loan, the date set forth in the related Mortgage Note on which the Mortgage Interest Rate on such Adjustable Rate Mortgage Loan is adjusted in accordance with the terms of the related Mortgage Note.

-2-

<u>Agreement</u>:   This Master Mortgage Loan Purchase and Interim Servicing Agreement including all exhibits, schedules, amendments and supplements hereto.

<u>Appraised Value</u>:  With respect to any Mortgaged Property, the lesser of (i) the value thereof as determined by an appraisal made for the originator of the Mortgage Loan at the time of origination of the Mortgage Loan by an appraiser who met the minimum requirements of FNMA and FHLMC, and (ii) the purchase price paid for the related Mortgaged Property by the Mortgagor with the proceeds of the Mortgage Loan, provided, however, in the case of a Refinanced Mortgage Loan, such value of the Mortgaged Property is based solely upon the value determined by an appraisal made for the originator of such Refinanced Mortgage Loan at the time of origination of such Refinanced Mortgage Loan by an appraiser who met the minimum requirements of FNMA and FHLMC.

<u>Assignment and Conveyance</u>:  An assignment and conveyance of the Mortgage Loans purchased on a Closing Date in the form annexed hereto as <u>Exhibit 4</u>.

<u>Assignment of Mortgage</u>: An individual assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to give record notice of the sale of the Mortgage to the Purchaser.

<u>Balloon Loan</u>: A Mortgage Loan identified on the Mortgage Loan Schedule as a balloon mortgage loan.

<u>Business Day</u>: Any day other than a Saturday or Sunday, or a day on which banking and savings and loan institutions in the State of Colorado or the State of New York are authorized or obligated by law or executive order to be closed.

<u>Cash-Out Refinancing</u>: A Refinanced Mortgage Loan the proceeds of which were in excess of the principal balance of any existing first mortgage on the related Mortgaged Property and related closing costs, and were used to pay any such existing first mortgage, related closing costs and subordinate mortgages on the related Mortgaged Property.

<u>Closing Date</u>: The date or dates on which the Purchaser from time to time shall purchase and the Seller from time to time shall sell to the Purchaser, the Mortgage Loans listed on the related Mortgage Loan Schedule with respect to the related Mortgage Loan Package.

<u>Closing Documents</u>:  With respect to any Closing Date, the documents required pursuant to Section 9.

<u>Code</u>: The Internal Revenue Code of 1986, or any successor statute thereto.

<u>Combined Loan to Value Ratio or CLTV</u>:  With respect to any Mortgage Loan, the fraction, expressed as a percentage, the numerator of which is the sum of (a) the original principal balance of the Mortgage Loan, plus (b) the unpaid principal balance of any related subordinate mortgage loan or loans secured by the Mortgaged Property, and the denominator of which is the Appraised Value of the related Mortgaged Property.

-3-

Commitment Letter: With respect to any Mortgage Loan Package purchased and sold on any Closing Date, the letter agreement between the Purchaser and the Seller, in the form annexed hereto as Exhibit 9 (including any exhibits, schedules and attachments thereto), setting forth the terms and conditions of such transaction and describing the Mortgage Loans to be purchased by the Purchaser on such Closing Date. A Commitment Letter may relate to more than one Mortgage Loan Package to be purchased on one or more Closing Dates hereunder.

Condemnation Proceeds: All awards, compensation and settlements in respect of a taking of all or part of a Mortgaged Property by exercise of the power of condemnation or the right of eminent domain.

Convertible Mortgage Loan: A Mortgage Loan that by its terms and subject to certain conditions contained in the related Mortgage or Mortgage Note allows the Mortgagor to convert the adjustable Mortgage Interest Rate on such Mortgage Loan to a fixed Mortgage Interest Rate.

Credit Score: The credit score of the Mortgagor provided by Fair, Isaac & Company, Inc. or such other organization providing credit scores at the time of the origination of a Mortgage Loan. If two credit scores are obtained, the Credit Score shall be the lower of the two credit scores. If three credit scores are obtained, the Credit Score shall be the middle of the three credit scores.

Custodial Agreement: The agreement governing the retention of the originals of each Mortgage Note, Mortgage, Assignment of Mortgage and other Mortgage Loan Documents.

Custodian: The custodian under the Custodial Agreement, or its successor in interest or assigns, or any successor to the Custodian under the Custodial Agreement, as therein provided.

Cut-off Date: The first day of the month in which the related Closing Date occurs or as otherwise set forth in the related Commitment Letter.

Determination Date: With respect to each Distribution Date, the last day of the calendar month immediately preceding such Distribution Date.

Distribution Date: The fifth (5th) day of each month, commencing, for any Mortgage Loan Package on the fifth (5th) day of the month next following the month in which the related Cut-off Date occurs, or if such fifth (5th) day is not a Business Day, the first Business Day immediately following such fifth (5th) day.

Due Date: With respect to each Distribution Date, the first day of the calendar month in which such Distribution Date occurs, which is the day on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

Due Period: With respect to each Distribution Date, the period commencing on the second day of the month preceding the month of the Distribution Date and ending on the first day of the month of the Distribution Date.

-4-

**Eligible Account:** Either (i) an account or accounts maintained with a federal or state chartered depository institution or trust company the short-term unsecured debt obligations of which (or, in the case of a depository institution or trust company that is the principal subsidiary of a holding company, the short-term unsecured debt obligations of such holding company of which) are rated A-1 by S&P or Prime-1 by Moody's (or a comparable rating if another rating agency is specified by the Initial Purchaser by written notice to the Seller) at the time any amounts are held on deposit therein, (ii) an account or accounts the deposits in which are fully insured by the FDIC or (iii) a trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity. Eligible Accounts may bear interest.

**Escrow Payments:** The amounts constituting ground rents, taxes, assessments, water charges, sewer rents, Primary Insurance Policy premiums, fire and hazard insurance premiums and other payments required to be escrowed by the Mortgagor with the Mortgagee pursuant to the terms of any Mortgage Note or Mortgage.

**Event of Default:** Any one of the events enumerated in Subsection 14.1.

**FDIC:** The Federal Deposit Insurance Corporation, or any successor thereto.

**FHLMC:** Freddie Mac or any successor thereto.

**Final Recovery Determination:** With respect to any defaulted Mortgage Loan or any REO Property (other than a Mortgage Loan or REO Property repurchased by the Seller pursuant to this Agreement), a determination made by the Seller that all Insurance Proceeds, Liquidation Proceeds and other payments or recoveries which the Seller, in its reasonable good faith judgment, expects to be finally recoverable in respect thereof have been so recovered. The Seller shall maintain records, prepared by a servicing officer of the Seller, of each Final Recovery Determination.

**First Lien:** With respect to each Mortgaged Property, the lien of the mortgage, deed of trust or other instrument securing a Mortgage Note which creates a first lien on the Mortgaged Property.

**Fixed Rate Mortgage Loan:** A Mortgage Loan with respect to which the Mortgage Interest Rate set forth in the Mortgage Note is fixed for the term of such Mortgage Loan.

**Flood Zone Service Contract:** A transferable contract maintained for the Mortgaged Property with a nationally recognized flood zone service provider for the purpose of obtaining the current flood zone status relating to such Mortgaged Property.

**FNMA:** Fannie Mae or any successor thereto.

**Gross Margin:** With respect to any Adjustable Rate Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note and the related Mortgage Loan Schedule that is added to the Index on each Adjustment Date in accordance with the terms of the related Mortgage Note to determine the new Mortgage Interest Rate for such Mortgage Loan.

-5-

**HUD**: The United States Department of Housing and Urban Development or any successor thereto.

**Index**: With respect to any Adjustable Rate Mortgage Loan, the index identified on the Mortgage Loan Schedule and set forth in the related Mortgage Note for the purpose of calculating the interest rate thereon.

**Initial Closing Date**: The Closing Date on which the Initial Purchaser purchases and the Seller sells the first Mortgage Loan Package hereunder.

**Initial Purchaser**: DB Structured Products, Inc., or any successor thereto or its assignees.

**Insurance Proceeds**: With respect to each Mortgage Loan, proceeds of insurance policies insuring the Mortgage Loan or the related Mortgaged Property.

**Interim Servicing Period**:  With respect to any Mortgage Loan, the period commencing on the related Closing Date and ending on the thirtieth day after such Closing Date (or if such day is not a Business Day, the first Business Day immediately following such day). The Interim Servicing Period shall continue for additional thirty (30) day periods following the expiration of the prior thirty (30) day period, unless the Purchaser notifies the Seller prior to the expiration of an Interim Servicing Period that the Seller shall be terminated as interim servicer at the expiration of the Interim Servicing Period.

**Liquidation Proceeds**:  Amounts, other than Insurance Proceeds and Condemnation Proceeds, received in connection with the liquidation of a defaulted Mortgage Loan through trustee's sale, foreclosure sale or otherwise, other than amounts received following the acquisition of REO Property and prior to an REO Disposition.

**Loan-to-Value Ratio** or **LTV**: With respect to any Mortgage Loan as of any date of determination, the ratio on such date of the outstanding principal amount of the Mortgage Loan, to the Appraised Value of the Mortgaged Property.

**Maximum Mortgage Interest Rate**: With respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Mortgage Loan Schedule and in the related Mortgage Note and is the maximum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be increased on any Adjustment Date.

**MERS**:  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

**MERS Mortgage Loan**: Any Mortgage Loan registered with MERS on the MERS System.

**MERS System**:  The system of recording transfers of mortgages electronically maintained by MERS.

**MIN**: The Mortgage Identification Number for any MERS Mortgage Loan.

-6-

**Minimum Mortgage Interest Rate:** With respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Mortgage Loan Schedule and in the related Mortgage Note and is the minimum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be decreased on any Adjustment Date.

**MOM Loan:** Any Mortgage Loan as to which MERS is acting as mortgagee, solely as nominee for the originator of such Mortgage Loan and its successors and assigns.

**Monthly Payment:** With respect to any Mortgage Loan, the scheduled combined payment of principal and interest, and taxes and insurance, if applicable, payable by a Mortgagor under the related Mortgage Note on each Due Date.

**Moody's:** Moody's Investors Service, Inc. or its successor in interest.

**Mortgage:** The mortgage, deed of trust or other instrument creating a first or second lien on Mortgaged Property securing the Mortgage Note.

**Mortgagee:** The mortgagee or beneficiary named in the Mortgage and the successors and assigns of such mortgagee or beneficiary.

**Mortgage File:** The items pertaining to a particular Mortgage Loan referred to in Exhibit 5 annexed hereto, and any additional documents required to be added to the Mortgage File pursuant to this Agreement or the related Commitment Letter.

**Mortgage Interest Rate:** With respect to each Fixed Rate Mortgage Loan, the fixed annual rate of interest provided for in the related Mortgage Note and, with respect to each Adjustable Rate Mortgage Loan, the annual rate that interest accrues on such Adjustable Rate Mortgage Loan from time to time in accordance with the provisions of the related Mortgage Note.

**Mortgage Loan:** Each first or second lien, residential mortgage loan, sold, assigned and transferred to the Purchaser pursuant to this Agreement and the related Commitment Letter and identified on the Mortgage Loan Schedule annexed to this Agreement on the related Closing Date, which Mortgage Loan includes without limitation the Mortgage File, the Monthly Payments, Principal Prepayments, Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds, REO Disposition proceeds, and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.

**Mortgage Loan Documents:** The documents listed in Exhibit 10 hereto pertaining to any Mortgage Loan.

**Mortgage Loan Package:** The Mortgage Loans listed on a Mortgage Loan Schedule, delivered to the Custodian and the Purchaser at least three (3) Business Days prior to the related Closing Date and attached to an Assignment and Conveyance as Schedule One on the related Closing Date.

-7-

Mortgage Loan Schedule: With respect to each Mortgage Loan Package, the schedule of Mortgage Loans to be annexed to an Assignment and Conveyance as Schedule One on each Closing Date for the Mortgage Loan Package delivered on such Closing Date in both hard copy and electronic form, such schedule setting forth the following information with respect to each Mortgage Loan in the Mortgage Loan Package: (1) the Seller's Mortgage Loan identifying number; (2) the Mortgagor's first and last name; (3) the street address of the Mortgaged Property including the state and zip code; (4) a code indicating whether the Mortgaged Property is owner-occupied; (5) the type of Residential Dwelling constituting the Mortgaged Property; (6) the original months to maturity; (7) the original date of the Mortgage Loan and the remaining months to maturity from the Cut-off Date, based on the original amortization schedule; (8) the Loan-to-Value Ratio and, if the Mortgage Loan is a Second Lien Mortgage Loan, the Combined Loan-to-Value Ratio, each at origination; (9) the Mortgage Interest Rate in effect immediately following the Cut-off Date; (10) the date on which the first Monthly Payment was due on the Mortgage Loan; (11) the stated maturity date; (12) the amount of the Monthly Payment at origination; (13) the amount of the Monthly Payment as of the Cut-off Date; (14) the last Due Date on which a Monthly Payment was actually applied to the unpaid Stated Principal Balance; (15) the original principal amount of the Mortgage Loan and, if such Mortgage Loan is a Second Lien Mortgage Loan, the principal balance of the related first lien at origination of the Mortgage Loan; (16) the Stated Principal Balance of the Mortgage Loan as of the close of business on the Cut-off Date; (17) with respect to each Adjustable Rate Mortgage Loan, the first Adjustment Date; (18) with respect to each Adjustable Rate Mortgage Loan, the Gross Margin; (19) a code indicating the purpose of the loan (i.e., purchase financing, Rate/Term Refinancing, Cash-Out Refinancing); (20) with respect to each Adjustable Rate Mortgage Loan, the Maximum Mortgage Interest Rate under the terms of the Mortgage Note; (21) with respect to each Adjustable Rate Mortgage Loan, the Minimum Mortgage Interest Rate under the terms of the Mortgage Note; (22) the Mortgage Interest Rate at origination; (23) with respect to each Adjustable Rate Mortgage Loan, the Periodic Rate Cap; (24) with respect to each Adjustable Rate Mortgage Loan, the first Adjustment Date immediately following the related Cut-off Date; (25) with respect to each Adjustable Rate Mortgage Loan, the Index; (26) the date on which the first Monthly Payment was due on the Mortgage Loan and, if such date is not consistent with the Due Date currently in effect, such Due Date; (27) a code indicating whether the Mortgage Loan is an Adjustable Rate Mortgage Loan or a Fixed Rate Mortgage Loan; (28) a code indicating the documentation style (i.e., full, alternative or reduced); (29) a code indicating if the Mortgage Loan is subject to a Primary Insurance Policy; (30) the Appraised Value of the Mortgaged Property; (31) the sale price of the Mortgaged Property, if applicable; (32) a code indicating whether the Mortgage Loan is subject to a Prepayment Charge, the term of such Prepayment Charge and the amount of such Prepayment Charge; (33) the product type (e.g., 2/28, 15 year fixed, 30 year fixed, 15/30 balloon, etc.); (34) the Mortgagor's debt to income ratio; (35) a code indicating whether the Mortgaged Property is subject to a First Lien or a Second Lien; (36) a code indicating the Credit Score of the Mortgagor at the time of origination of the Mortgage Loan; (37) the Mortgage Loan's payment history; (38) a code indicating the form of appraisal (i.e. form 1004, 2055, etc.); (39) a code indicating whether the Mortgage Loan is a MERS Mortgage Loan and, if so, the corresponding MIN; and (40) a code indicating if the Mortgage Loan is an interest-only Mortgage Loan and, if so, the term of the interest-only period of such Mortgage Loan. With respect to the Mortgage Loan Package in the aggregate, the Mortgage Loan Schedule shall set forth the following information, as of the related Cut-off Date: (1) the

-8-

number of Mortgage Loans; (2) the current principal balance of the Mortgage Loans; (3) the weighted average Mortgage Interest Rate of the Mortgage Loans; and (4) the weighted average maturity of the Mortgage Loans.

Mortgage Note: The original executed note or other evidence of the Mortgage Loan indebtedness of a Mortgagor.

Mortgaged Property: The Mortgagor's real property securing repayment of a related Mortgage Note, consisting of a fee simple interest in a single parcel of real property improved by a Residential Dwelling.

Mortgagor: The obligor on a Mortgage Note, the owner of the Mortgaged Property and the grantor or mortgagor named in the related Mortgage and such grantor's or mortgagor's successors in title to the Mortgaged Property.

Officer's Certificate: A certificate signed by the Chairman of the Board or the Vice Chairman of the Board or a President or a Vice President and by the Treasurer or the Secretary or one of the Assistant Treasurers or Assistant Secretaries of the Person on behalf of whom such certificate is being delivered.

Opinion of Counsel: A written opinion of counsel, who may be salaried counsel for the Person on behalf of whom the opinion is being given, reasonably acceptable to each Person to whom such opinion is addressed.

Pass-Through Transfer: The sale or transfer of some or all of the Mortgage Loans by the Purchaser to a trust to be formed as part of a publicly issued or privately placed mortgage-backed securities transaction.

Periodic Rate Cap: With respect to each Adjustable Rate Mortgage Loan and any Adjustment Date therefor, a number of percentage points per annum that is set forth in the related Mortgage Loan Schedule and in the related Mortgage Note, which is the maximum amount by which the Mortgage Interest Rate for such Adjustable Rate Mortgage Loan may increase (without regard to the Maximum Mortgage Interest Rate) or decrease (without regard to the Minimum Mortgage Interest Rate) on such Adjustment Date from the Mortgage Interest Rate in effect immediately prior to such Adjustment Date.

Person: An individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Prepayment Charge: With respect to any Mortgage Loan, any prepayment penalty or premium thereon payable in connection with a principal prepayment on such Mortgage Loan pursuant to the terms of the related Mortgage Note.

Primary Insurance Policy: A policy of primary mortgage guaranty insurance issued by a Qualified Insurer.

-9-

**Principal Prepayment**: Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any Prepayment Charge, which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

**Purchase Price**: The price paid on the related Closing Date by the Purchaser to the Seller pursuant to the related Commitment Letter in exchange for the Mortgage Loans purchased on such Closing Date as provided in Section 4.

**Qualified Insurer**: Any insurer which meets the requirements of FNMA and FHLMC.

**Rate/Term Refinancing**: A Refinanced Mortgage Loan, the proceeds of which are not in excess of the existing first mortgage loan on the related Mortgaged Property and related closing costs, and were used exclusively to satisfy the then existing first mortgage loan of the Mortgagor on the related Mortgaged Property and to pay related closing costs.

**Reconstitution Agreements**: The agreement or agreements entered into by the Seller and the Purchaser and/or certain third parties on the Reconstitution Date or Dates with respect to any or all of the Mortgage Loans serviced hereunder, in connection with a Whole Loan Transfer or a Pass-Through Transfer as provided in Section 12.

**Reconstitution Date**: The date or dates on which any or all of the Mortgage Loans serviced under this Agreement shall be removed from this Agreement and reconstituted as part of a Whole Loan Transfer or Pass-Through Transfer pursuant to Section 12 hereof.

**Record Date**: With respect to each Distribution Date, the last Business Day of the month immediately preceding the month in which such Distribution Date occurs.

**Refinanced Mortgage Loan**: A Mortgage Loan the proceeds of which were not used to purchase the related Mortgaged Property.

**REO Disposition**: The final sale by the Seller of any REO Property.

**REO Property**: A Mortgaged Property acquired as a result of the liquidation of a Mortgage Loan.

**Repurchase Price**: With respect to any Mortgage Loan, (1) a price equal to (a) the Purchase Price percentage used to calculate the Purchase Price, as stated in the related Commitment Letter, times the Stated Principal Balance of the Mortgage Loan so repurchased plus (b) accrued interest thereon at the Mortgage Interest Rate from the interest paid to date, to but not including, the day such repurchase occurs or (2) such other amount set forth in the related Commitment Letter.

**Residential Dwelling**: Any one of the following: (i) a one-family dwelling, (ii) a two- to four-family dwelling, (iii) a one-family dwelling unit in a FNMA eligible condominium project, or (iv) a one-family dwelling in a planned unit development, none of which is

-10-

manufactured housing, a co-operative, a commercial property, an agricultural property or a mixed-use property.

Second Lien: With respect to each Mortgaged Property, the lien of the mortgage, deed of trust or other instrument securing a Mortgage Note which creates a second lien on the Mortgaged Property.

Second Lien Mortgage Loan: A Mortgage Loan secured by the lien on the Mortgaged Property, subject to one prior lien on such Mortgaged Property securing financing obtained by the related Mortgagor.

Servicing Advances: All customary, reasonable and necessary "out-of-pocket" costs and expenses incurred by the Seller in the performance of its servicing obligations, including, but not limited to, the cost of (i) preservation, restoration and repair of a Mortgaged Property, (ii) any enforcement or judicial proceedings with respect to a Mortgage Loan, including foreclosure actions and (iii) the management and liquidation of REO Property.

Servicing Fee: With respect to each Mortgage Loan, the monthly fee set forth in the related Commitment Letter which the Purchaser shall pay to the Seller. The obligation of the Purchaser to pay the Servicing Fee is limited to, and payable solely from, the interest portion (including recoveries with respect to interest from Liquidation Proceeds and other proceeds, to the extent permitted by Section 11.05) of related Monthly Payment collected by the Seller, or as otherwise provided under Section 11.05. If the Interim Servicing Period includes any partial month, the Servicing Fee for such month shall be pro rated at a per diem rate based upon a 30-day month.

Servicing File: With respect to each Mortgage Loan, the file retained by the Seller consisting of originals of all documents in the Mortgage File which are not delivered to the Purchaser or the Custodian and copies of all of the Mortgage Loan Documents for such Mortgage Loan.

Servicing Transfer Date: With respect to any Mortgage Loan, the date on which the Seller transfers the servicing of a Mortgage Loan to the Initial Purchaser or its designee, which date shall be the day immediately following the expiration of the related Interim Servicing Period.

S&P: Standard & Poor's, a division of the McGraw-Hill Companies, Inc., or its successor in interest.

Stated Principal Balance: As to each Mortgage Loan as of any date of determination, (i) the principal balance of the Mortgage Loan as of the Cut-off Date after giving effect to payments of principal received on or before such date, minus (ii) all amounts previously distributed to the Purchaser with respect to the related Mortgage Loan representing payments or recoveries of principal.

-11-

Tax Service Contract:  A transferable contract maintained for the Mortgaged Property with a tax service provider for the purpose of obtaining current information from local taxing authorities relating to such Mortgaged Property.

Whole Loan Transfer:  Any sale or transfer of some or all of the Mortgage Loans by the Purchaser to a third party, which sale or transfer is not a Pass-Through Transfer.

SECTION 2.   Agreement to Purchase.   The Seller agrees to sell, and the Purchaser agrees to purchase, from time-to-time, Mortgage Loans having an aggregate principal balance on the related Cut-off Date in an amount as set forth in the related Commitment Letter, or in such other amount as agreed to by the Purchaser and the Seller as evidenced by the actual aggregate principal balance of the Mortgage Loans accepted by the Purchaser on the related Closing Date.

SECTION 3.   Mortgage Loan Schedules.   The Seller shall deliver the Mortgage Loan Schedule for a Mortgage Loan Package to be purchased on a particular Closing Date to the Purchaser at least three (3) Business Days prior to the related Closing Date or as otherwise set forth in the related Commitment Letter.

SECTION 4.   Purchase Price.   The Purchase Price for each Mortgage Loan listed on the related Mortgage Loan Schedule shall be the percentage of par as stated in the related Commitment Letter (subject to adjustment as provided therein), multiplied by its Stated Principal Balance as of the related Cut-off Date. If so provided in the related Commitment Letter, portions of the Mortgage Loans shall be priced separately.The Purchaser shall own and be entitled to receive with respect to each Mortgage Loan purchased, (1) all recoveries of principal collected after the related Cut off Date and (2) all payments of interest on the Mortgage Loans net of the Servicing Fee (minus that portion of any such interest payment that is allocable to the period prior to the related Cut-off Date).  All payments of principal and interest, less the applicable Servicing Fee, due on a Due Date following the related Cut off Date shall belong to the Purchaser.

SECTION 5.   Examination of Mortgage Files; Corporate Due Diligence.

In  addition to the rights granted to the Initial Purchaser under the related Commitment Letter to underwrite the Mortgage Loans and review the Mortgage Files prior to the related Closing Date, the Seller shall (a) deliver to the Custodian in escrow, for examination with respect to each Mortgage Loan to be purchased on such Closing Date, the related Mortgage File, including the Assignment of Mortgage, pertaining to each Mortgage Loan, or (b) make the related Mortgage File available to the Initial Purchaser for examination at the Seller's offices or such other location as shall otherwise be agreed upon by the Initial Purchaser and the Seller. Such examination may be made by the Initial Purchaser or its designee at any reasonable time before or after the related Closing Date. If the Initial Purchaser makes such examination prior to the related Closing Date and identifies any Mortgage Loans that do not conform to the terms of the related Commitment Letter, such Mortgage Loans may, at the Initial Purchaser's option, be rejected for purchase by the Initial Purchaser.  If not purchased by the Initial Purchaser, such Mortgage Loans shall be deleted from the related Mortgage Loan Schedule. The Initial Purchaser may, at its option and without notice to the Seller, purchase all or part of any Mortgage Loan

-12-

Package without conducting any partial or complete examination. The fact that the Initial Purchaser has conducted or has determined not to conduct any partial or complete examination of the Mortgage Files shall not affect the Initial Purchaser's (or any of its successors') rights to demand repurchase or other relief or remedy provided for in this Agreement.

The Initial Purchaser shall have the opportunity to conduct a corporate due diligence of the Seller, including but not limited to, on site review of the Seller's facilities and discussions with the Seller's management. The Initial Purchaser may conduct such review prior to or following the Initial Closing Date. In addition, the Initial Purchaser may perform additional reviews as the Initial Purchaser, in its sole discretion, deems necessary.

SECTION 6.   Conveyance from Seller to Initial Purchaser.

Subsection 6.1.        Conveyance of Mortgage Loans; Possession of Servicing
                       Files

The Seller, simultaneously with the payment of the Purchase Price, shall execute and deliver to the Initial Purchaser an Assignment and Conveyance with respect to the related Mortgage Loan Package in the form attached hereto as Exhibit 4. The Servicing File retained by the Seller with respect to each Mortgage Loan pursuant to this Agreement shall be appropriately identified in the Seller's computer system to reflect clearly the sale of such related Mortgage Loan to the Purchaser. The Seller shall release from its custody the contents of any Servicing File retained by it only in accordance with this Agreement, except when such release is required in connection with a repurchase of any such Mortgage Loan pursuant to Subsection 7.3 or 7.4.

In addition, in connection with the assignment of any MERS Mortgage Loans, the Seller agrees that it will cause, at its own expense, the MERS System to indicate that such Mortgage Loans have been assigned by the Seller to the Purchaser in accordance with this Agreement by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement prior to the related Servicing Transfer Date) in such computer files the information required by the MERS System to identify the Purchaser of such Mortgage Loans.

Subsection 6.2.        Books and Records.

Record title to each Mortgage and the related Mortgage Note as of the related Closing Date shall be in the name of the Seller, the Purchaser, the Custodian or one or more designees of the Purchaser, as the Purchaser shall designate. Notwithstanding the foregoing, beneficial ownership of each Mortgage and the related Mortgage Note shall be vested solely in the Purchaser or the appropriate designee of the Purchaser, as the case may be. All rights arising out of the Mortgage Loans including, but not limited to, all funds received by the Seller after the related Cut-off Date on or in connection with a Mortgage Loan as provided in Section 4 shall be vested in the Purchaser or one or more designees of the Purchaser; provided, however, that all such funds received on or in connection with a Mortgage Loan as provided in Section 4 shall be received and held by the Seller in trust for the benefit of the Purchaser or the assignee of the Purchaser, as the case may be, as the owner of the Mortgage Loans pursuant to the terms of this Agreement.

-13-

It is the express intention of the parties that the transactions contemplated by this Agreement be, and be construed as, a sale of the Mortgage Loans by the Seller and not a pledge of the Mortgage Loans by the Seller to the Purchaser to secure a debt or other obligation of the Seller. Consequently, the sale of each Mortgage Loan shall be reflected as a sale on the Seller's business records, tax returns and financial statements. In the event, for any reason, any transaction contemplated herein is construed by any court or regulatory authority as a borrowing rather than as a sale, the Seller and the Purchaser intend that the Purchaser or its assignee, as the case may be, shall have a perfected first priority security interest in the Mortgage Loans, the servicing rights appurtenant to the Mortgage Loans, any funds related to the Mortgage Loans in an account in which the Seller makes deposits pursuant to Section 11(b) and the proceeds of any and all of the foregoing (collectively, the "Collateral"), free and clear of adverse claims. In such case, the Seller shall be deemed to have hereby granted to the Purchaser or its assignee, as the case may be, a first priority security interest in and lien upon the Collateral, free and clear of adverse claims. In such event, the related Commitment Letter and this Agreement shall constitute a security agreement, the Custodian shall be deemed to be an independent custodian for purposes of perfection of the security interest granted to the Purchaser or its assignee, as the case may be, and the Purchaser or its assignee, as the case may be, shall have all of the rights of a secured party under applicable law.

Subsection 6.3.        Delivery of Mortgage Loan Documents.

The Seller shall from time to time in connection with each Closing Date, at least five (5) Business Days prior to such Closing Date, deliver and release to the Custodian those Mortgage Loan Documents as required by this Agreement with respect to each Mortgage Loan to be purchased and sold on the related Closing Date and set forth on the related Mortgage Loan Schedule delivered with such Mortgage Loan Documents.

The Custodian shall certify its receipt of all such Mortgage Loan Documents required to be delivered pursuant to the Custodial Agreement for the related Closing Date, as evidenced by the Trust Receipt and Initial Certification of the Custodian in the form annexed to the Custodial Agreement. The Seller shall be responsible for maintaining the Custodial Agreement during the Interim Servicing Period. The fees and expenses of the Custodian shall be paid by the Purchaser and the Seller as set forth in the related Commitment Letter.

The Seller shall forward to the Custodian original documents evidencing an assumption, modification, consolidation or extension of any Mortgage Loan entered into in accordance with this Agreement within two weeks of their execution, provided, however, that the Seller shall provide the Custodian with a certified true copy of any such document submitted for recordation within two weeks of its execution, and shall provide the original of any document submitted for recordation or a copy of such document certified by the appropriate public recording office to be a true and complete copy of the original within ninety days of its submission for recordation.

SECTION 7.    Representations, Warranties and Covenants of the Seller;
Remedies for Breach.

Subsection 7.1.        Representations and Warranties Respecting the Seller.

-14-

(a)    The Seller represents, warrants and covenants to the Purchaser as of the Initial Closing Date and each subsequent Closing Date or as of such date specifically provided herein or in the applicable Assignment and Conveyance:

(1)    The Seller is duly organized, validly existing and in good standing under the laws of the state of Colorado and is and will remain in compliance with the laws of each state in which any Mortgaged Property is located to the extent necessary to ensure the enforceability of each Mortgage Loan and the servicing of the Mortgage Loan in accordance with the terms of this Agreement. No licenses or approvals obtained by the Seller have been suspended or revoked by any court, administrative agency, arbitrator or governmental body and no proceedings are pending which might result in such suspension or revocation;

(2)    The Seller has the full power and authority to hold each Mortgage Loan, to sell each Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate, all transactions contemplated by this Agreement. The Seller has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the Purchaser, constitutes a legal, valid and binding obligation of the Seller, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency or reorganization;

(3)    The execution and delivery of this Agreement by the Seller and the performance of and compliance with the terms of this Agreement will not violate the Seller's articles of incorporation or by-laws or constitute a default under or result in a breach or acceleration of, any material contract, agreement or other instrument to which the Seller is a party or which may be applicable to the Seller or its assets;

(4)    The Seller is not in violation of, and the execution and delivery of this Agreement by the Seller and its performance and compliance with the terms of this Agreement will not constitute a violation with respect to, any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over the Seller or its assets, which violation might have consequences that would materially and adversely affect the condition (financial or otherwise) or the operation of the Seller or its assets or might have consequences that would materially and adversely affect the performance of its obligations and duties hereunder;

(5)    The Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

(6)    The Mortgage Loan Documents and any other documents required to be delivered with respect to each Mortgage Loan pursuant to this

-15-

Agreement, have been delivered to the Custodian all in compliance with the specific requirements of this Agreement;

(7)    Immediately prior to the payment of the Purchase Price for each Mortgage Loan, the Seller was the owner of record of the related Mortgage and the indebtedness evidenced by the related Mortgage Note and upon the payment of the Purchase Price by the Purchaser, in the event that the Seller retains record title, the Seller shall retain such record title to each Mortgage, each related Mortgage Note and the related Mortgage Files with respect thereto in trust for the Purchaser as the owner thereof and only for the purpose of servicing and supervising the servicing of each Mortgage Loan;

(8)    There are no actions or proceedings against, or investigations of, the Seller before any court, administrative agency or other tribunal (A) that might prohibit its entering into this Agreement, (B) seeking to prevent the sale of the Mortgage Loans or the consummation of the transactions contemplated by this Agreement or (C) that might prohibit or materially and adversely affect the performance by the Seller of its obligations under, or the validity or enforceability of, this Agreement;

(9)    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Seller of, or compliance by the Seller with, this Agreement or the consummation of the transactions contemplated by this Agreement, except for such consents, approvals, authorizations or orders, if any, that have been obtained prior to the related Closing Date;

(10)    The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Seller, and the transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by the Seller pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions;

(11)    Neither this Agreement nor any written statement, report or other document prepared and furnished or to be prepared and furnished by the Seller pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading;

(12)    The consideration received by the Seller upon the sale of the Mortgage Loans constitutes fair consideration and reasonably equivalent value for such Mortgage Loans;

(13)    The Seller is solvent and will not be rendered insolvent by the consummation of the transactions contemplated hereby. The Seller is not

-16-

transferring any Mortgage Loan with any intent to hinder, delay or defraud any of its creditors;

(14)   With respect to each Mortgage Loan, the Seller is in possession of a complete Mortgage File in compliance with Exhibit 5, except for such documents as have been delivered to the Custodian;

(15)   The Seller is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the MERS Mortgage Loans for as long as such Mortgage Loans are registered with MERS.

Subsection 7.2.         Representations and Warranties Regarding Individual
                                      Mortgage Loans

The Seller hereby represents and warrants to the Purchaser that, as to each Mortgage Loan, as of the related Closing Date for such Mortgage Loan:

(1)   The information set forth in the related Mortgage Loan Schedule and the Mortgage Loan data delivered to the Purchaser is complete, true and correct;

(2)   The Mortgage Loan is in compliance with all requirements set forth in the related Commitment Letter, and the characteristics of the related Mortgage Loan Package as set forth in the related Commitment Letter are true and correct;

(3)   Each document or instrument in the related Mortgage File is in a form generally acceptable to prudent mortgage lenders that regularly originate or purchase mortgage loans comparable to the Mortgage Loans for sale to prudent investors in the secondary market that invest in mortgage loans such as the Mortgage Loans;

(4)   Except for payments in the nature of Escrow Payments, including without limitation, taxes and insurance payments, the Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds from a party other than the owner of the related Mortgaged Property, directly or indirectly, for the payment of any amount required by the Mortgage Note or the Mortgage, except for interest accruing from the date of the Mortgage Note or the date of disbursement of the Mortgage proceeds, whichever is greater, to the day which precedes by one month the Due Date of the first installment of principal and interest;

(5)   There are no delinquent taxes, ground rents, water charges, sewer rents, assessments, insurance premiums, leasehold payments, including assessments payable in future installments or other outstanding charges affecting the related Mortgaged Property;

-17-

(6)    The Mortgaged Property is located in the state identified in the related Mortgage Loan Schedule and is improved by a Residential Dwelling;

(7)    The terms of the Mortgage Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments, recorded in the applicable public recording office if necessary to maintain the lien priority of the Mortgage, and which have been delivered to the Custodian; the substance of any such waiver, alteration or modification has been approved by the insurer under the Primary Insurance Policy, if any, and the title insurer, to the extent required by the related policy, and is reflected on the related Mortgage Loan Schedule. No instrument of waiver, alteration or modification has been executed, and no Mortgagor has been released, in whole or in part, except in connection with an assumption agreement approved by the insurer under the Primary Insurance Policy, if any, the title insurer, to the extent required by the policy, and which assumption agreement has been delivered to the Custodian and the terms of which are reflected in the related Mortgage Loan Schedule;

(8)    The Mortgage Note and the Mortgage are not subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, nor will the operation of any of the terms of the Mortgage Note and/or the Mortgage, or the exercise of any right thereunder, render the Mortgage Note or the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto;

(9)    All buildings upon the Mortgaged Property are insured by an insurer acceptable to FNMA and FHLMC against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located, pursuant to insurance policies conforming to the requirements of the Servicing Addendum. All such insurance policies contain a standard mortgagee clause naming the Seller, its successors and assigns as mortgagee and all premiums thereon have been paid. If the Mortgaged Property is in an area identified on a Flood Hazard Map or Flood Insurance Rate Map issued by the Federal Emergency Management Agency as having special flood hazards (and such flood insurance has been made available) a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration is in effect, which policy conforms to the requirements of FNMA and FHLMC. The Mortgage obligates the Mortgagor thereunder to maintain all such insurance at the Mortgagor's cost and expense, and on the Mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor;

(10)    Each Mortgage Loan and, if any, the related Prepayment Charge complied in all material respects with any and all requirements of any

-18-

federal, state or local law including, without limitation, usury, truth in lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, fair housing, disclosure laws or all predatory and abusive lending laws applicable to the origination and servicing of mortgage loans of a type similar to the Mortgage Loans have been complied with and the consummation of the transactions contemplated hereby will not involve the violation of any such laws, and the Seller shall maintain in its possession, available for the inspection of the Purchaser or its designee, and shall deliver to the Purchaser or its designee, upon two Business Days' request, evidence of compliance with such requirements;

(11) The Mortgage has not been satisfied, cancelled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such satisfaction, cancellation, subordination, rescission or release;

(12) The related Mortgage is properly recorded and is a valid, existing and enforceable (A) first lien and first priority security interest with respect to each Mortgage Loan which is indicated by the Seller to be a First Lien (as reflected on the Mortgage Loan Schedule), or (B) second lien and second priority security interest with respect to each Mortgage Loan which is indicated by the Seller to be a Second Lien (as reflected on the Mortgage Loan Schedule), in either case, on the Mortgaged Property, including all improvements on the Mortgaged Property subject only to (a) the lien of current real property taxes and assessments not yet due and payable, (b) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording being acceptable to mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the originator of the Mortgage Loan and which do not adversely affect the Appraised Value of the Mortgaged Property, (c) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property and (d) with respect to each Mortgage Loan which is indicated by the Seller to be a Second Lien Mortgage Loan (as reflected on the Mortgage Loan Schedule) a First Lien on the Mortgaged Property. Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates a valid, existing and enforceable (A) first lien and first priority security interest with respect to each Mortgage Loan which is indicated by the Seller to be a First Lien (as reflected on the Mortgage Loan Schedule) or (B) second lien and second priority security interest with respect to each Mortgage Loan which is indicated by the Seller to be a Second Lien Mortgage Loan (as reflected on the Mortgage Loan Schedule), in either case, on the property described therein and the Seller has full right to sell and assign the same to the Purchaser. The Mortgaged Property was not, as of the date of origination of the Mortgage Loan,

-19-

subject to a mortgage, deed of trust, deed to secure debt or other security instrument creating a lien subordinate to the lien of the Mortgage;

(13)   The Mortgage Note and the related Mortgage are genuine and each is the legal, valid and binding obligation of the Mortgagor and enforceable by the Purchaser against such Mortgagor in accordance with its terms, except only as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by law;

(14)   All parties to the Mortgage Note and the Mortgage had legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note and the Mortgage, and the Mortgage Note and the Mortgage have been duly and properly executed by such parties. The Mortgagor is a natural person;

(15)   The proceeds of the Mortgage Loan have been fully disbursed to or for the account of the Mortgagor and there is no obligation for the Mortgagee to advance additional funds thereunder and any and all requirements as to completion of any on-site or off-site improvement and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage have been paid, and the Mortgagor is not entitled to any refund of any amounts paid or due to the Mortgagee pursuant to the Mortgage Note or Mortgage;

(16)   The Seller is the sole legal, beneficial and equitable owner of the Mortgage Note and the Mortgage. The Seller has full right and authority under all governmental and regulatory bodies having jurisdiction over such Seller, subject to no interest or participation of, or agreement with, any party, to transfer and sell the Mortgage Loan to the Purchaser pursuant to this Agreement free and clear of any encumbrance or right of others, equity, lien, pledge, charge, mortgage, claim, participation interest or security interest of any nature (collectively, a "Lien"); and immediately upon the transfers and assignments herein contemplated, the Seller shall have transferred and sold all of its right, title and interest in and to each Mortgage Loan and the Purchaser will hold good, marketable and indefeasible title to, and be the owner of, each Mortgage Loan subject to no Lien;

(17)   All parties which have had any interest in the Mortgage Loan, whether as originator, mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were): (A) organized under the laws of such state, or (B) qualified to do business in such state, or (C) federal savings and loan associations or national banks having principal offices in such state, or (D) not doing business in such state so as to require qualification or licensing, or (E) not otherwise required to be licensed in such state. All parties which have had any interest in the Mortgage Loan were in

-20-

compliance with any and all applicable "doing business" and licensing requirements of the laws of the state wherein the Mortgaged Property is located or were not required to be licensed in such state;

(18)   The Mortgage Loan is covered by an American Land Title Association ("ALTA") ALTA lender's title insurance policy (which, in the case of an Adjustable Rate Mortgage Loan has an adjustable rate mortgage endorsement in the form of ALTA 6.0 or 6.1) acceptable to FNMA and FHLMC, issued by a title insurer acceptable to FNMA and FHLMC and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring (subject to the exceptions contained in (11)(a) and (b) and, with respect to each Mortgage Loan which is indicated by the Seller to be a Second Lien Mortgage Loan (as reflected on the Mortgage Loan Schedule), clause (d)) the Seller, its successors and assigns as to the first priority lien of the Mortgage in the original principal amount of the Mortgage Loan, and, with respect to any Adjustable Rate Mortgage Loan, against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage providing for adjustment in the Mortgage Interest Rate and Monthly Payment. Additionally, such lender's title insurance policy affirmatively insures ingress and egress to and from the Mortgaged Property, and against encroachments by or upon the Mortgaged Property or any interest therein. The Seller is the sole insured of such lender's title insurance policy, and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this Agreement. No claims have been made under such lender's title insurance policy, and no prior holder of the related Mortgage, including the Seller, has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy;

(19)   Except as set forth in the related Commitment Letter and other than payments due but not yet 30 days or more delinquent, there is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and, to the Seller's knowledge, no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and neither the Seller nor any other entity involved in originating or servicing a Mortgage Loan has waived any default, breach, violation or event of acceleration.  With respect to each Mortgage Loan which is indicated by the Seller to be a Second Lien Mortgage Loan (as reflected on the Mortgage Loan Schedule) (i) the First Lien is in full force and effect, (ii) there is no default, breach, violation or event of acceleration existing under such First Lien mortgage or the related mortgage note, (iii) no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration thereunder, and either (A) the First Lien mortgage contains a provision which allows or (B) applicable law requires, the mortgagee under the Second Lien Mortgage Loan to receive notice of, and affords such mortgagee an

-21-

opportunity to cure any default by payment in full or otherwise under the First Lien mortgage;

(20)  There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such lien) affecting the related Mortgaged Property which are or may be liens prior to, or equal or coordinate with, the lien of the related Mortgage;

(21)  All improvements which were considered in determining the Appraised Value of the related Mortgaged Property lay wholly within the boundaries and building restriction lines of the Mortgaged Property, and no improvements on adjoining properties encroach upon the Mortgaged Property;

(22)  [Reserved];

(23)  Payments on the Mortgage Loan shall commence (with respect to any newly originated Mortgage Loans) or commenced no more than sixty days after the proceeds of the Mortgage Loan were disbursed.  The Mortgage Loan bears interest at the Mortgage Interest Rate.  With respect to each Mortgage Loan, the Mortgage Note is payable on the first day of each month in Monthly Payments, which, (A) in the case of a Fixed Rate Mortgage Loan, are sufficient to fully amortize the original principal balance over the original term thereof and to pay interest at the related Mortgage Interest Rate, (B) in the case of an Adjustable Rate Mortgage Loan, are changed on each Adjustment Date, and in any case, are sufficient to fully amortize the original principal balance over the original term thereof and to pay interest at the related Mortgage Interest Rate and (C) in the case of a Balloon Loan, are based on a fifteen (15) or thirty (30) year amortization schedule, as set forth in the related Mortgage Note, and a final monthly payment substantially greater than the preceding monthly payment which is sufficient to amortize the remaining principal balance of the Balloon Loan and to pay interest at the related Mortgage Interest Rate.  The Index for each Adjustable Rate Mortgage Loan is as defined in the related Mortgage Loan Schedule.  With respect to each Mortgage Loan identified on the Mortgage Loan Schedule as an interest-only Mortgage Loan, the interest-only period shall not exceed the period specified on the Mortgage Loan Schedule and following the expiration of such interest-only period, the remaining Monthly Payments shall be sufficient to fully amortize the original principal balance over the remaining term of the Mortgage Loan.  The Mortgage Note does not permit negative amortization.  No Mortgage Loan is a Convertible Mortgage Loan;

(24)  The origination and collection practices used by the Seller with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing industry. The Mortgage Loan has been serviced by the Seller and any predecessor servicer in accordance with all applicable laws, rules and regulations, the terms of the Mortgage Note and Mortgage, and in accordance with accepted servicing

-22-

practices. With respect to escrow deposits and Escrow Payments (other than with respect to each Mortgage Loan which is indicated by the Seller to be a Second Lien Mortgage Loan and for which the mortgagee under the First Lien is collecting Escrow Payments (as reflected on the Mortgage Loan Schedule)), if any, all such payments are in the possession of, or under the control of, the Seller and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. No escrow deposits or Escrow Payments or other charges or payments due the Seller have been capitalized under any Mortgage or the related Mortgage Note and no such escrow deposits or Escrow Payments are being held by the Seller for any work on a Mortgaged Property which has not been completed;

(25)   The Mortgaged Property is free of damage and waste and there is no proceeding pending or threatened for the total or partial condemnation thereof nor is such a proceeding currently occurring;

(26)   The Mortgage and related Mortgage Note contain customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby, including, (a) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (b) otherwise by judicial foreclosure.  The Mortgaged Property has not been subject to any bankruptcy proceeding or foreclosure proceeding and the Mortgagor has not filed for protection under applicable bankruptcy laws.  There is no homestead or other exemption available to the Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage;

(27)   The Mortgagor has not notified the Seller and the Seller has no knowledge of any relief requested or allowed to the Mortgagor under the Servicemembers Civil Relief Act;

(28)   The Mortgage Note is not and has not been secured by any collateral except the lien of the corresponding Mortgage on the Mortgaged Property and the security interest of any applicable security agreement or chattel mortgage referred to in (12) above;

(29)   The Mortgage File contains an appraisal of the related Mortgaged Property which was made and signed, prior to the approval of the Mortgage Loan application, by a qualified appraiser, duly appointed by the Seller, who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, whose compensation is not affected by the approval or disapproval of the Mortgage Loan and who met the minimum qualifications of FNMA and FHLMC.  Each appraisal of the Mortgage Loan was made in accordance with the relevant provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989;

-23-

(30)  In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by the Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor;

(31)  No Mortgage Loan contains provisions pursuant to which Monthly Payments are (a) paid or partially paid with funds deposited in any separate account established by the Seller, the Mortgagor, or anyone on behalf of the Mortgagor, (b) paid by any source other than the Mortgagor or (c) contains any other similar provisions which may constitute a "buydown" provision. The Mortgage Loan is not a graduated payment mortgage loan and the Mortgage Loan does not have a shared appreciation or other contingent interest feature;

(32)  The Mortgagor has executed a statement to the effect that the Mortgagor has received all disclosure materials required by applicable law with respect to the making of fixed rate mortgage loans in the case of Fixed Rate Mortgage Loans, and adjustable rate mortgage loans in the case of Adjustable Rate Mortgage Loans and rescission materials with respect to Refinanced Mortgage Loans, and such statement is and will remain in the Mortgage File;

(33)  No Mortgage Loan was made in connection with (a) the construction or rehabilitation of a Mortgaged Property or (b) facilitating the trade-in or exchange of a Mortgaged Property;

(34)  Each Mortgage Loan identified on the Mortgage Loan Schedule as subject to a Primary Mortgage Insurance Policy will be subject to a Primary Mortgage Insurance Policy, issued by a Qualified Insurer, which insures that portion of the Mortgage Loan in excess of the portion of the Appraised Value of the Mortgaged Property required by FNMA. All provisions of such Primary Insurance Policy have been and are being complied with, such policy is in full force and effect, and all premiums due thereunder have been paid. Any Mortgage subject to any such Primary Insurance Policy obligates the Mortgagor thereunder to maintain such insurance and to pay all premiums and charges in connection therewith. The Mortgage Interest Rate for the Mortgage Loan does not include any such insurance premium;

(35)  The Mortgaged Property is lawfully occupied under applicable law; all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities. No improvement located on or being part of any Mortgaged Property is in violation of any applicable zoning law or regulation.  To the best of the Seller's knowledge and with respect to each Mortgage Loan that is covered by a Primary Mortgage Policy, the improvement(s)

-24-

located on or being part of the related Mortgaged Property were constructed in accordance with the specifications set forth in the original construction plans;

(36)   No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person, including without limitation the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan;

(37)   Each original Mortgage was recorded and all subsequent assignments of the original Mortgage (other than the assignment to the Purchaser) have been recorded, or are in the process of being recorded, in the appropriate jurisdictions wherein such recordation is necessary to perfect the lien thereof as against creditors of the Seller.  As to any Mortgage Loan which is not a MERS Mortgage Loan, the Assignment of Mortgage is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located;

(38)   Any principal advances made to the Mortgagor prior to the Cut-off Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term reflected on the Mortgage Loan Schedule.  The lien of the Mortgage securing the consolidated principal amount is expressly insured as having (A) first lien priority with respect to each Mortgage Loan which is indicated by the Seller to be a First Lien (as reflected on the Mortgage Loan Schedule), or (B) second lien priority with respect to each Mortgage Loan which is indicated by the Seller to be a Second Lien Mortgage Loan (as reflected on the Mortgage Loan Schedule), in either case, by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to FNMA and FHLMC.  The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan;

(39)   No Mortgage Loan has a balloon payment feature;

(40)   Each Mortgaged Property consists of a fee simple interest in a single parcel of real property improved by a Residential Dwelling.  If the Residential Dwelling on the Mortgaged Property is a condominium unit or a unit in a planned unit development (other than a de minimis planned unit development) such condominium or planned unit development project meets the eligibility requirements of FNMA and FHLMC;

(41)   Each Mortgage Loan originated in the state of Texas pursuant to Article XVI, Section 50(a)(6) of the Texas Constitution (a "Texas Refinance Loan") has been originated in compliance with the provisions of Article XVI, Section 50(a)(6) of the Texas Constitution, Texas Civil Statutes and the Texas Finance Code.  With respect to each Texas Refinance Loan that is a

-25-

Cash Out Refinancing, the related Mortgage Loan Documents state that the Mortgagor may prepay such Texas Refinance Loan in whole or in part without incurring a Prepayment Charge. The Seller does not collect any such Prepayment Charges in connection with any such Texas Refinance Loan;

(42)    Interest on each Mortgage Loan is calculated on the basis of a 360-day year consisting of twelve 30-day months;

(43)    The Mortgaged Property is in material compliance with all applicable environmental laws pertaining to environmental hazards including, without limitation, asbestos, and the Seller or to the Seller's knowledge, the related Mortgagor, has not received any notice of any violation or potential violation of such law;

(44)    The Seller shall, at its own expense, cause each Mortgage Loan to be covered by a "life of loan" Tax Service Contract which is assignable to the Purchaser or its designee at no cost to the Purchaser or its designee; provided however, that if the Seller fails to purchase such Tax Service Contract, the Seller shall be required to reimburse the Purchaser for all costs and expenses incurred by the Purchaser in connection with the purchase of any such Tax Service Contract;

(45)    Each Mortgage Loan is covered by a "life of loan" Flood Zone Service Contract which is assignable to the Purchaser or its designee at no cost to the Purchaser or its designee or, for each Mortgage Loan not covered by such Flood Zone Service Contract, the Seller agrees to purchase such Flood Zone Service Contract;

(46)    No Mortgage Loan is (a) subject to, covered by or in violation of the provisions of the Homeownership and Equity Protection Act of 1994, as amended, (b) a "high cost", "covered", "abusive", "predatory", "home loan", "Oklahoma Section 10" or "high risk" mortgage loan (or a similarly designated loan using different terminology) under any federal, state or local law, including without limitation, the provisions of the Georgia Fair Lending Act, New York Banking Law, Section 6-1, the Arkansas Home Loan Protection Act, effective as of June 14, 2003, Kentucky State Statute KRS 360.100, effective as of June 25, 2003, the New Jersey Home Ownership Security Act of 2002 (the "NJ Act"), the New Mexico Home Loan Protection Act (N.M. Stat. Ann. §§ 58-21A-1 et seq.), the Illinois High-Risk Home Loan Act (815 Ill. Comp. Stat. 137/1 et seq.), the Oklahoma Home Ownership and Equity Protection Act, Nevada Assembly Bill No. 284, effective as of Oct. 1, 2003, the Minnesota Residential Mortgage Originator and Servicer Licensing Act (MN Stat. §58.137), the South Carolina High-Cost and Consumer Home Loans Act, effective January 1, 2004, or any other statute or regulation providing assignee liability to holders of such mortgage loans, or (c) subject to or in violation of any such or comparable federal, state or local statutes or regulations;

-26-

(47) With respect to any First Lien Mortgage Loan, the Loan-to-Value Ratio of such Mortgage Loan at origination was not more than 100% and with respect to any Mortgage Loan, the CLTV of such Mortgage Loan at origination was not more than 100%;

(48) Each Mortgage Loan constitutes a "qualified mortgage" under Section 860G(a)(3)(A) of the Code and Treasury Regulation Section 1.860G-2(a)(1);

(49) No Mortgage Loan had an original term to maturity of more than thirty (30) years;

(50) No Mortgagor is the obligor on more than two Mortgage Notes;

(51) Each Mortgage contains a provision for the acceleration of the payment of the unpaid principal balance of the related Mortgage Loan in the event the related Mortgaged Property is sold without the prior consent of the mortgagee thereunder;

(52) With respect to each Mortgage Loan which is a Second Lien, (i) the related first lien does not provide for negative amortization and (ii) either no consent for the Mortgage Loan is required by the holder of the first lien or such consent has been obtained and is contained in the Mortgage File;

(53) No Mortgage Loan originated prior to October 1, 2002 has a Prepayment Charge longer than five years after its origination; and no Mortgage Loan originated after October 1, 2002 has a Prepayment Charge longer than three years after its origination;

(54) The Mortgage Loan Documents with respect to each Mortgage Loan subject to Prepayment Charges specifically authorizes such Prepayment Charges to be collected, such Prepayment Charges are permissible and enforceable in accordance with the terms of the related Mortgage Loan Documents and all applicable federal, state and local laws (except to the extent that the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally or the collectability thereof may be limited due to acceleration in connection with a foreclosure) and each Prepayment Charge was originated in compliance with all applicable federal, state and local laws;

(55) No Mortgagor was required to purchase any credit life, disability, accident or health insurance product as a condition of obtaining the extension of credit. No Mortgagor obtained a prepaid single premium credit life, disability, accident or health insurance policy in connection with the origination of the Mortgage Loan, and no proceeds from any Mortgage Loan were used to

-27-

finance single-premium credit insurance policies as part of the origination of, or as a condition to closing, such Mortgage Loan;

(56)  No Mortgage Loan originated or modified on or after October 1, 2002 and prior to March 7, 2003 is secured by a Mortgaged Property located in the State of Georgia;

(57)  The Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws").  The Seller has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws; no Mortgage Loan is subject to nullification pursuant to Executive Order 13224 (the "Executive Order") or the regulations promulgated by the Office of Foreign Assets Control of the United States Department of the Treasury (the "OFAC Regulations") or in violation of the Executive Order or the OFAC Regulations, and no Mortgagor is subject to the provisions of such Executive Order or the OFAC Regulations nor listed as a "blocked person" for purposes of the OFAC Regulations;

(58)  No Mortgage Loan is a "manufactured housing loan" pursuant to the NJ Act, and one hundred percent of the amount financed of any purchase money Second Lien Mortgage Loan subject to the NJ Act was used for the purchase of the related Mortgaged Property;

(59)  With respect to each MERS Mortgage Loan, a MIN has been assigned by MERS and such MIN is accurately provided on the related Mortgage Loan Schedule. The related assignment of Mortgage to MERS has been duly and properly recorded;

(60)  With respect to each MERS Mortgage Loan, the Seller has not received any notice of liens or legal actions with respect to such Mortgage Loan and no such notices have been electronically posted by MERS;

(61)  With respect to any Mortgage Loan for which a mortgage loan application was submitted by the Mortgagor after April 1, 2004, no such Mortgage Loan secured by Mortgaged Property in the State of Illinois which has a Mortgage Interest Rate in excess of 8.0% per annum has lender-imposed fees (or other charges) in excess of 3.0% of the original principal balance of the Mortgage Loan;

-28-

(62)   No Mortgage Loan is secured in whole or in part by the interest of the Mortgagor as a lessee under a ground lease of the related Mortgaged Property; and

(63)   No Mortgage Loan originated on or after November 7, 2004 secured by a Mortgaged Property located in the State of Massachusetts is a Refinanced Mortgage Loan.

Subsection 7.3.       Remedies for Breach of Representations and Warranties.

It is understood and agreed that the representations and warranties set forth in Subsections 7.1 and 7.2 shall survive the sale of the Mortgage Loans to the Purchaser and shall inure to the benefit of the Purchaser, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment of Mortgage or the examination or lack of examination of any Mortgage File. Upon discovery by the Seller or the Purchaser of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of the Mortgage Loans or the interest of the Purchaser (or which materially and adversely affects the interests of the Purchaser in the related Mortgage Loan in the case of a representation and warranty relating to a particular Mortgage Loan), the party discovering such breach shall give prompt written notice to the other.

Within sixty (60) days (or with respect to a breach of Section 7.2(62), within ten (10) days) of the earlier of either discovery by or notice to the Seller of any breach of a representation or warranty which materially and adversely affects the value of a Mortgage Loan or the Mortgage Loans, the Seller shall use its best efforts promptly to cure such breach in all material respects and, if such breach cannot be cured, the Seller shall, at the Purchaser's option, repurchase such Mortgage Loan at the Repurchase Price within two (2) Business Days following the expiration of the related cure period.  In the event that a breach shall involve any representation or warranty set forth in Subsection 7.1 and such breach cannot be cured within 60 days of the earlier of either discovery by or notice to the Seller of such breach, all of the Mortgage Loans shall, at the Purchaser's option, be repurchased by the Seller at the Repurchase Price.  With respect to any representations and warranties made by the Seller, in the event that it is discovered that the circumstances with respect to the Mortgage Loan are not accurately reflected in such representation and warranty notwithstanding the actual knowledge or lack of knowledge of Seller; then, notwithstanding that such representation and warranty is made "to the best of the Seller's knowledge," or in reliance on or based on other information, there shall be a breach of such representation and Seller shall cure such breach or repurchase the affected Mortgage Loan as provided in this Subsection 7.3.  Any repurchase of a Mortgage Loan(s) pursuant to the foregoing provisions of this Subsection 7.3 shall occur on a date designated by the Purchaser and shall be accomplished (i) by wire transfer of immediately available funds on the repurchase date to an account designated by the Initial Purchaser or (ii) as otherwise set forth in the related Commitment Letter. Notwithstanding anything to the contrary contained herein, it is understood by the parties hereto that a breach of the representations and warranties made in Subsections 7.2(46), (53), (55) or (56) will be deemed to materially and adversely affect the value of the related Mortgage Loan or the interest of the Purchaser therein.

-29-

If pursuant to the foregoing provisions the Seller repurchases a Mortgage Loan that is a MERS Mortgage Loan, the Seller shall either (i) cause MERS to execute and deliver an assignment of the Mortgage in recordable form to transfer the Mortgage from MERS to the Seller and shall cause such Mortgage to be removed from registration on the MERS System in accordance with MERS' rules and regulations or (ii) cause MERS to designate on the MERS System the Seller as the beneficial holder of such Mortgage Loan.

At the time of repurchase of any deficient Mortgage Loan, the Purchaser and the Seller shall arrange for the reassignment of the repurchased Mortgage Loan to the Seller and the delivery to the Seller of any documents held by the Custodian relating to the repurchased Mortgage Loan. In no event shall the Repurchase Price be deposited in any account, other than an account in which deposits are made pursuant to Section 11(b), at the time of repurchase. Upon such repurchase the related Mortgage Loan Schedule shall be amended to reflect the withdrawal of the repurchased Mortgage Loan from this Agreement.

In addition to such cure and repurchase obligation, the Seller shall indemnify the Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach of the Seller's representations and warranties contained in this Section 7. It is understood and agreed that the obligations of the Seller set forth in this Subsection 7.3 to cure or repurchase a defective Mortgage Loan and to indemnify the Purchaser as provided in this Subsection 7.3 constitute the sole remedies of the Purchaser respecting a breach of the foregoing representations and warranties. The indemnification obligation of the Seller set forth herein shall survive the termination of this Agreement notwithstanding any applicable statute of limitations, which the Seller hereby expressly waives.

Any cause of action against the Seller relating to or arising out of the breach of any representations and warranties made in Subsections 7.1 or 7.2 shall accrue as to any Mortgage Loan upon (i) discovery of such breach by the Purchaser or notice thereof by the Seller to the Purchaser, (ii) failure by the Seller to cure such breach or repurchase such Mortgage Loan as specified above, and (iii) demand upon the Seller by the Purchaser for compliance with the relevant provisions of this Agreement.

SECTION 8.   Closing.   The closing for each Mortgage Loan Package shall take place on the related Closing Date. At the Purchaser's option, the closing shall be either by telephone, confirmed by letter or wire as the parties shall agree, or conducted in person, at such place as the parties shall agree.

The closing for the Mortgage Loans to be purchased on each Closing Date shall be subject to each of the following conditions:

> (a)   all of the representations and warranties of the Seller under this Agreement shall be true and correct as of the related Closing Date and no event shall have occurred which, with reasonable notice to the Seller or the passage of time, would constitute a default under this Agreement;

-30-

(b) the Initial Purchaser shall have received, or the Initial Purchaser's attorneys shall have received in escrow, all Closing Documents as specified in Section 9, in such forms as are agreed upon and acceptable to the Purchaser, duly executed by all signatories other than the Purchaser as required pursuant to the terms hereof;

(c) the Seller shall have delivered and released to the Custodian all documents required pursuant to this Agreement; and

(d) all other terms and conditions of this Agreement shall have been complied with.

Subject to the foregoing conditions, the Initial Purchaser shall pay to the Seller on the related Closing Date the Purchase Price, plus accrued interest pursuant to Section 4, by wire transfer of immediately available funds to the account designated by the Seller.

SECTION 9.    Closing Documents.

(a) On or before the Initial Closing Date, the Seller shall submit to the Initial Purchaser fully executed originals of the following documents:

   (1) this Agreement, in four counterparts; and

   (2) [reserved];

   (3) [reserved];

   (4) an Officer's Certificate, in the form of Exhibit 1 hereto, including all attachments thereto.

(b) The Closing Documents for the Mortgage Loans to be purchased on each Closing Date shall consist of fully executed originals of the following documents:

   (1) the related Commitment Letter;

   (2) the related Mortgage Loan Schedule to be attached to the related Assignment and Conveyance;

   (3) a Custodian's trust receipt and initial certification, as required under the Custodial Agreement, in a form acceptable to the Initial Purchaser;

   (4) an Officer's Certificate, in the form of Exhibit 1 hereto, including all attachments thereto;

   (5) [reserved];

-31-

(6)  a Security Release Certification, in the form of Exhibit 3 hereto executed by any Person, as requested by the Initial Purchaser, if any of the Mortgage Loans has at any time been subject to any security interest, pledge or hypothecation for the benefit of such Person;

(7) . a certificate or other evidence of merger or change of name, signed or stamped by the applicable regulatory authority, if any of the Mortgage Loans were acquired by the Seller by merger or acquired or originated by the Seller while conducting business under a name other than its present name, if applicable; and

(8)  an Assignment and Conveyance in the form of Exhibit 4 hereto.

SECTION 10. Costs. The Purchaser shall pay any commissions due its salesmen and the legal fees and expenses of its attorneys. All other costs and expenses incurred in connection with the transfer and delivery of the Mortgage Loans, including without limitation recording fees, fees for title policy endorsements and continuations, fees for recording Assignments of Mortgage and the Seller's attorney's fees, shall be paid by the Seller. The Seller shall also pay certain expenses of the Custodian, including but not limited to, the Custodian's preparation of trust receipts and certifications.

SECTION 11. Seller's Servicing Obligations. The Mortgage Loans have been sold by the Seller to the Purchaser on a servicing released basis. Subject to and upon the terms and conditions of this Agreement (with respect to each Mortgage Loan, for an interim period, as specified herein), the Seller hereby sells, transfers assigns, conveys and delivers to the Purchaser the servicing rights.

The Purchaser shall retain the Seller as contract servicer of the Mortgage Loans for an interim period. The Seller shall service the Mortgage Loans pursuant to and in accordance with the terms and conditions contained in this Agreement and the Accepted Servicing Practices. In connection with the interim servicing and administering the Mortgage Loans, the Seller shall employ procedures including collection procedures and exercise the same care that it customarily employs and exercises in servicing and administering mortgage loans for its own account giving due consideration to accepted mortgage servicing practices of prudent lending institutions and the Purchaser's reliance on the Seller. Further, the Seller shall take special care in ascertaining and estimating annual ground rents, taxes, assessments, water rates, fire and hazard insurance premiums, mortgage insurance premiums, and all other charges that, as provided in the Mortgage, will become due and payable to the end that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable, and shall make Servicing Advances in connection with any non-payment by the related Mortgagor. Any payments received by the Seller and due to Purchaser from a Mortgagor shall be remitted by wire transfer of immediately available funds to the Purchaser within 24 hours of the Seller's receipt of such funds; provided however, any payment received by the Seller from a Mortgagor in connection with an early scheduled monthly payment or pay-ahead shall be remitted by wire transfer of immediately available funds to the Purchaser on the Servicing Transfer Date.

-32-

The Seller shall transfer the servicing of the Mortgage Loans on each Servicing Transfer Date in accordance with this Section 11.

(a)    Transfer Procedures.  On or prior to the applicable Servicing Transfer Date, the Seller shall, at its sole cost and expense, take such steps as may be necessary or appropriate to effectuate and evidence the transfer of the servicing of the related Mortgage Loans to the Purchaser, or its designee, including but not limited to the following:

(i)    Notice to Mortgagors.  The Seller shall mail to the Mortgagor of each related Mortgage Loan a letter advising such Mortgagor of the transfer of the servicing of the related Mortgage Loan to the Purchaser, or its designee, in accordance with the Cranston Gonzales National Affordable Housing Act of 1990; provided, however, the content and format of the letter shall have the prior approval of the Purchaser.  The Seller shall provide the Purchaser with copies of all such related notices no later than the Servicing Transfer Date.

(ii)    Notice to Taxing Authorities and Insurance Companies.  The Seller shall transmit to the applicable taxing authorities and insurance companies (including primary mortgage insurance policy insurers, if applicable) and/or agents, notification of the transfer of the servicing to the Purchaser, or its designee, and instructions to deliver all notices, tax bills and insurance statements, as the case may be, to the Purchaser or its designee from and after the Servicing Transfer Date.  The Seller shall provide the Purchaser or its designee with copies of all such notices no later than the Servicing Transfer Date.

(iii)    Delivery of Servicing Records.  The Seller shall forward to the Purchaser, or its designee, all servicing records and the Servicing File in the Seller's possession relating to each related Mortgage Loan.

(iv)    Escrow Payments.  The Seller shall provide the Purchaser, or its designee, with immediately available funds by wire transfer in the amount of the net escrow payments and suspense balances and all loss draft balances associated with the related Mortgage Loans.  The Seller shall provide the Purchaser or its designee with an accounting statement, in electronic format acceptable to the Purchaser in its sole discretion, of escrow payments and suspense balances and loss draft balances sufficient to enable the Purchaser or its designee to reconcile the amount of such payment with the accounts of the Mortgage Loans.  Additionally, the Seller shall wire transfer to the Purchaser the amount of any agency, trustee or prepaid Mortgage Loan payments and all other similar amounts held by the Seller.

(v)    Payoffs and Assumptions.  The Seller shall provide to the Purchaser, or its designee, copies of all assumption and payoff statements generated by the

-33-

Seller on the related Mortgage Loans from the related Cut-off Date to the Servicing Transfer Date.

(vi)  Mortgage Payments Received after the Cut-Off Date.  The amount of any payments received by the Seller with respect to the Mortgage Loans after the Servicing Transfer Date shall be forwarded to the Purchaser or its designee by overnight mail on the date of receipt or by wire transfer on the next succeeding Business Day.  The Seller shall notify the Purchaser or its designee of the particulars of the payment, which notification requirement shall be satisfied if the Seller forwards with its payment sufficient information to permit appropriate processing of the payment by the Purchaser or its designee.  The Seller shall assume full responsibility for the necessary and appropriate legal application of such payments with respect to the Mortgage Loans received by the Seller after the Cut-Off Date with respect to the Mortgage Loans, including but not limited to Mortgage Loans then in foreclosure or bankruptcy; provided, for purposes of this Agreement, necessary and appropriate legal application of such payments shall include, but not be limited to, endorsement of a payment to the Purchaser or its designee with the particulars of the payment such as the account number, dollar amount, date received and any special Mortgagor application instructions and the Seller shall comply with the foregoing requirements with respect to all payments with respect to the Mortgage Loans received after the Servicing Transfer Date.

(vii)  Misapplied Payments.   Misapplied payments shall be processed as follows:

(1)   All parties shall cooperate in correcting misapplication errors;

(2)   The party receiving notice of a misapplied payment occurring prior to the applicable Servicing Transfer Date and discovered after the Servicing Transfer Date shall immediately notify the other party;

(3)   Any check issued hereunder shall be accompanied by a statement indicating the corresponding Seller and/or the Purchaser Mortgage Loan identification number and an explanation of the allocation of any such payments.

(viii)  Books and Records.  On the Servicing Transfer Date, the books, records and accounts of the Seller with respect to the related Mortgage Loans shall be in accordance with all applicable Purchaser requirements.

(ix)  Reconciliation.  The Seller shall, on or before the Servicing Transfer Date, reconcile principal balances and make any monetary adjustments required by the Purchaser.  Any such monetary adjustments will be transferred between the Seller and the Purchaser as appropriate.

-34-

(x)    IRS Forms. The Seller shall file all IRS forms 1099, 1099A, 1098 or 1041 and K-1 which are required to be filed on or before the Servicing Transfer Date in relation to the servicing and ownership of the related Mortgage Loans. The Seller shall provide copies of such forms to the Purchaser or its designee upon request and shall reimburse the Purchaser or its designee for any costs or penalties incurred by the Purchaser or its designee due to the Seller's failure to comply with this paragraph.

(b)    Collection Payments. The Seller shall hold all funds collected and received pursuant to each Mortgage Loan segregated from any of its own funds and general assets.

The Seller shall deposit in an Eligible Account on a daily basis, and retain therein the following payments and collections received by it subsequent to the Cut-off Date, or received by it prior to the Cut-off Date but allocable to a period subsequent thereto, other than in respect of principal and interest on the Mortgage Loans due on or before the Cut-off Date:

(i)    all payments on account of principal on the Mortgage Loans;

(ii)    all payments on account of interest on the Mortgage Loans, including all Prepayment Charges;

(iii)    all Liquidation Proceeds;

(iv)    all Insurance Proceeds;

(v)    all Condemnation Proceeds affecting any Mortgaged Property which are not released to the Mortgagor in accordance with the Seller's normal servicing procedures, the loan documents or applicable law;

(vi)    all proceeds of any Mortgage Loan repurchased in accordance with Subsections 7.03 and 7.04 and all amounts required to be deposited by the Seller in connection with shortfalls in principal amount of Qualified Substitute Mortgage Loans pursuant to Subsection 7.03;

(vii)    any amounts required to be deposited by the Seller in connection with the deductible clause in any blanket hazard insurance policy. Such deposit shall be made from the Seller's own funds, without reimbursement therefor;

(viii)    any amounts required to be deposited by the Seller in connection with any REO Property;

(ix)    any payments in the nature of late payment charges and assumption fees; and

(x)    any payments required to be escrowed by the Mortgagor with the Mortgagee pursuant to the terms of the Mortgage Note or Mortgage.

-35-

Such account in which Seller makes deposits pursuant to this Section 11(b) shall be an Eligible Account. Any interest or earnings on funds deposited pursuant to this Section 11(b) by the depository institution shall accrue to the benefit of the Seller and the Seller shall be entitled to retain and withdraw such interest. With respect to any account in which deposits are made pursuant to this Section 11(b), the Seller shall give notice to the Purchaser of the location of any such account when established and prior to any change thereof.

If the balance on deposit in any account in which Seller makes deposits pursuant to this Section 11(b) exceeds $75,000 as of the commencement of business on any Business Day and such account constitutes an Eligible Account solely pursuant to clause (ii) of the definition of Eligible Account, the Seller shall, on or before twelve o'clock noon Eastern time on such Business Day, withdraw from such account any and all amounts payable to the Purchaser and remit such amounts to the Purchaser by wire transfer of immediately available funds.

SECTION 12. Removal of Mortgage Loans from Inclusion under This Agreement Upon a Whole Loan Transfer or a Pass-Through Transfer on One or More Reconstitution Dates.

The Seller and the Initial Purchaser agree that with respect to some or all of the Mortgage Loans, the Initial Purchaser may effect either:

(1)  one or more Whole Loan Transfers; and/or

(2)  one or more Pass-Through Transfers.

With respect to each Whole Loan Transfer or Pass-Through Transfer, as the case may be, entered into by the Initial Purchaser, the Seller agrees:

(1)  to cooperate fully with the Purchaser and any prospective purchaser with respect to all reasonable requests and due diligence procedures and with respect to the preparation (including, but not limited to, the endorsement, delivery, assignment, and execution) of the Mortgage Loan Documents and other related documents, and with respect to servicing requirements reasonably requested by the rating agencies and credit enhancers;

(2)  to execute all Reconstitution Agreements provided that each of the Seller and the Purchaser is given an opportunity to review and reasonably negotiate in good faith the content of such documents not specifically referenced or provided for herein;

(3)  with respect to any Whole Loan Transfer or Pass-Through Transfer, the Seller shall make the representations and warranties regarding the Seller and the Mortgage Loans as of the date of the Whole Loan Transfer or Pass-Through Transfer, modified to the extent necessary to accurately reflect the pool statistics of the Mortgage Loans as of the date of such Whole Loan Transfer or Pass-Through Transfer and

-36-

supplemented by additional representations and warranties that are not unreasonable under the circumstances as of the date of such Whole Loan Transfer or Pass-Through Transfer, to the extent that any events or circumstances, including changes in applicable law occurring subsequent to the related Closing Date(s), would render a related Mortgage Loan unmarketable to a material segment of the secondary mortgage or mortgage-backed securities market; and

(4)  to deliver to the Purchaser, and to any Person designated by the Purchaser, such legal documents and in-house Opinions of Counsel as are customarily delivered by originators or servicers, as the case may be, and reasonably determined by the Purchaser to be necessary in connection with Whole Loan Transfers or Pass-Through Transfers, as the case may be, such in-house Opinions of Counsel for a Pass-Through Transfer to be in the form reasonably acceptable to the Purchaser, it being understood that the cost of any opinions of outside special counsel that may be required for a Whole Loan Transfer or Pass-Through Transfer, as the case may be, shall be the responsibility of the Purchaser.

All Mortgage Loans not sold or transferred pursuant to a Whole Loan Transfer or Pass-Through Transfer shall be subject to this Agreement and shall continue to be serviced for the remainder of the Interim Servicing Period in accordance with the terms of this Agreement and with respect thereto this Agreement shall remain in full force and effect.

SECTION 13. The Seller.

Subsection 13.1.    Additional Indemnification by the Seller.

In addition to the indemnification provided in Subsection 7.3, the Seller shall indemnify the Purchaser and hold the Purchaser harmless against any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that the Purchaser may sustain in any way related to the failure of the Seller to perform its obligations under this Agreement including but not limited to the its obligation to service and administer the Mortgage Loans in strict compliance with the terms of this Agreement or any Reconstitution Agreement entered into pursuant to Section 12. The indemnification obligation of the Seller set forth herein shall survive the termination of this Agreement notwithstanding any applicable statute of limitations, which the Seller hereby expressly waives.

Subsection 13.2.    Merger or Consolidation of the Seller.

The Seller shall keep in full force and effect its existence, rights and franchises as a corporation under the laws of the state of its incorporation except as permitted herein, and shall obtain and preserve its qualification to do business as a foreign entity in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this

-37-

Agreement or any of the Mortgage Loans, and to enable the Seller to perform its duties under this Agreement.

Any Person into which the Seller may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Seller shall be a party, or any Person succeeding to the business of the Seller, shall be the successor of the Seller hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided, however, that the successor or surviving Person shall be an institution whose deposits are insured by FDIC or a company whose business is the origination and servicing of mortgage loans, shall be a FNMA or FHLMC approved seller/servicer and shall satisfy any requirements of Section 16 with respect to the qualifications of a successor to the Seller.

Subsection 13.3.    Limitation on Liability of the Seller and Others.

Neither the Seller nor any of the officers, employees or agents of the Seller shall be under any liability to the Purchaser for any action taken or for refraining from the taking of any action in good faith in connection with the servicing of the Mortgage Loans pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Seller or any such person against any breach of warranties or representations made herein, or failure to perform its obligations in strict compliance with any standard of care set forth in this Agreement, or any liability which would otherwise be imposed by reason of any breach of the terms and conditions of this Agreement. The Seller and any officer, employee or agent of the Seller may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder. The Seller shall not be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its obligation to sell or duty to service the Mortgage Loans in accordance with this Agreement and which in its opinion may result in its incurring any expenses or liability; provided, however, that the Seller may, with the consent of the Purchaser, undertake any such action which they may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto. In such event, the legal expenses and costs of such action and any liability resulting therefrom shall be expenses, costs and liabilities for which the Purchaser shall be liable, and the Seller shall be entitled to reimbursement therefor from the Purchaser upon written demand except when such expenses, costs and liabilities are subject to the Seller's indemnification under Subsections 7.3 or 13.1.

Subsection 13.4.    Seller Not to Resign.

The Seller shall not assign this Agreement or resign from the obligations and duties hereby imposed on it except by mutual consent of the Seller and the Purchaser or upon the determination that its servicing duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by the Seller in which event the Seller may resign as servicer. Any such determination permitting the resignation of the Seller as servicer shall be evidenced by an Opinion of Counsel to such effect delivered to the Purchaser which Opinion of Counsel shall be in form and substance acceptable to the Purchaser and which shall be provided at the cost of the Seller. No such resignation shall become effective until a successor shall have

-38-

assumed the Seller's responsibilities and obligations hereunder in the manner provided in Section 16.

Subsection 13.5.    No Transfer of Servicing.

The Seller acknowledges that the Purchaser has acted in reliance upon the Seller's independent status, the adequacy of its servicing facilities, plan, personnel, records and procedures, its integrity, reputation and financial standing and the continuance thereof. Without in any way limiting the generality of this Section, the Seller shall not either assign this Agreement or the servicing hereunder or delegate its rights or duties hereunder or any portion thereof, or sell or otherwise dispose of all or substantially all of its property or assets, without the prior written approval of the Purchaser, which consent will not be unreasonably withheld.

SECTION 14. DEFAULT.

Subsection 14.1.    Events of Default.

In case one or more of the following Events of Default by the Seller shall occur and be continuing, that is to say:

(i)    any failure by the Seller to remit to the Purchaser any payment required to be made under the terms of this Agreement which continues unremedied for a period of one Business Day after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to the Seller by the Purchaser; or

(ii)    failure on the part of the Seller duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Seller set forth in this Agreement which continues unremedied for a period of thirty days (except that such number of days shall be fifteen in the case of a failure to pay any premium for any insurance policy required to be maintained under this Agreement) after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Seller by the Purchaser; or

(iii)    a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Seller and such decree or order shall have remained in force undischarged or unstayed for a period of sixty days; or

(iv)    the Seller shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Seller of or relating to all or substantially all of its property; or

(v)    the Seller shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or

-39-

reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

            (vi)    failure by the Seller to be in compliance with the "doing business" or licensing laws of any jurisdiction where a Mortgaged Property is located; or

            (vii)    the Seller ceases to meet the qualifications of either a FNMA or FHLMC seller/servicer; or

            (viii)    the Seller attempts to assign its right to servicing compensation hereunder or the Seller attempts, without the consent of the Purchaser, to sell or otherwise dispose of all or substantially all of its property or assets or to assign this Agreement or the servicing responsibilities hereunder or to delegate its duties hereunder or any portion thereof;

then, and in each and every such case, so long as an Event of Default shall not have been remedied, the Purchaser, by notice in writing to the Seller, may, in addition to whatever rights the Purchaser may have at law or in equity to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Seller as servicer under this Agreement. On or after the receipt by the Seller of such written notice, all authority and power of the Seller to service the Mortgage Loans under this Agreement shall on the date set forth in such notice pass to and be vested in the successor appointed pursuant to Section 16.

If any of the Mortgage Loans are MERS Mortgage Loans, in connection with the termination or resignation (as described in Section 13.04) of the Seller hereunder, either (i) the successor Seller shall represent and warrant that it is a member of MERS in good standing and shall agree to comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS, or (ii) the Seller shall cooperate with the successor company either (x) in causing MERS to execute and deliver an assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Purchaser and to execute and deliver such other notices, documents and other instruments as may be necessary or desirable to effect a transfer of such Mortgage Loan or servicing of such Mortgage Loan on the MERS System to the successor company or (y) in causing MERS to designate on the MERS System the successor company as the servicer of such Mortgage Loan.

        Subsection 14.2.      Waiver of Defaults.

        The Purchaser may waive any default by the Seller in the performance of its obligations hereunder and its consequences. Upon any such waiver of a past default, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived.

        SECTION 15. Termination. The respective obligations and responsibilities of the Seller, as servicer, shall terminate at the expiration of the Interim Servicing Period unless terminated on an earlier date at the option of the Purchaser or pursuant to Section 14. Upon written request from the Purchaser in connection with any such termination, the Seller shall

-40-

prepare, execute and deliver any and all documents and other instruments, place in the Purchaser's possession all Mortgage Files, and do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise, at the Seller's sole expense. The Seller agrees to cooperate with the Purchaser and such successor in effecting the termination of the Seller's responsibilities and rights hereunder as servicer, including, without limitation, the transfer to such successor for administration by it of all cash amounts maintained by the Seller on the behalf of the Purchaser, or thereafter received with respect to the Mortgage Loans. The indemnification obligation of the Seller set forth herein shall survive the termination of this Agreement notwithstanding any applicable statute of limitations, which the Seller hereby expressly waives.

SECTION 16. Successor to the Seller.

Prior to termination of the Seller's responsibilities and duties under this Agreement pursuant to Section 12, 14 or 15, the Purchaser shall (i) succeed to and assume all of the Seller's responsibilities, rights, duties and obligations under this Agreement, or (ii) appoint a successor which shall succeed to all rights and assume all of the responsibilities, duties and liabilities of the Seller as servicer under this Agreement. In connection with such appointment and assumption, the Purchaser may make such arrangements for the reasonable compensation of such successor out of payments on Mortgage Loans as it and such successor shall agree. In the event that the Seller's duties, responsibilities and liabilities as servicer under this Agreement should be terminated pursuant to the aforementioned Sections, the Seller shall discharge such duties and responsibilities during the period from the date it acquires knowledge of such termination until the effective date thereof with the same degree of diligence and prudence which it is obligated to exercise under this Agreement, and shall take no action whatsoever that might impair or prejudice the rights or financial condition of the Purchaser or such successor. The termination of the Seller as servicer pursuant to the aforementioned Sections shall not become effective until a successor shall be appointed pursuant to this Section 16 and shall in no event relieve the Seller of the representations and warranties made pursuant to Subsections 7.1 and 7.2 and the remedies available to the Purchaser under Subsection 7.3, it being understood and agreed that the provisions of such Subsections 7.1, 7.2, and 7.3 shall be applicable to the Seller notwithstanding any such resignation or termination of the Seller, or the termination of this Agreement.

Any successor appointed as provided herein shall execute, acknowledge and deliver to the Seller and to the Purchaser an instrument accepting such appointment, whereupon such successor shall become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of the Seller, with like effect as if originally named as a party to this Agreement provided, however, that such successor shall not assume, and the Seller shall indemnify such successor for, any and all liabilities arising out of the Seller's acts as servicer. Any termination of the Seller as servicer pursuant to Section 12, 14 or 15 shall not affect any claims that the Purchaser may have against the Seller arising prior to any such termination or resignation or remedies with respect to such claims.

The Seller shall timely deliver to the successor the funds in any account in which deposits are made pursuant to Section 11(b) and the Mortgage Files and related documents and

-41-

statements held by it hereunder and the Seller shall account for all funds. The Seller shall execute and deliver such instruments and do such other things all as may reasonably be required to more fully and definitely vest and confirm in the successor all such rights, powers, duties, responsibilities, obligations and liabilities of the Seller as servicer. The successor shall make arrangements as it may deem appropriate to reimburse the Seller for amounts the Seller actually expended as servicer pursuant to this Agreement which the successor is entitled to retain hereunder and which would otherwise have been recovered by the Seller pursuant to this Agreement but for the appointment of the successor servicer.

## SECTION 17. Financial Statements.

The Seller understands that in connection with the Purchaser's marketing of the Mortgage Loans, the Purchaser shall make available to prospective purchasers the Seller's financial statements for the most recently completed three fiscal years respecting which such statements are available. The Seller also shall make available any comparable interim statements to the extent any such statements have been prepared by the Seller (and are available upon request to members or stockholders of the Seller). The Seller, if it has not already done so, agrees to furnish promptly to the Purchaser copies of the statements specified above. The Seller also shall make available information on its servicing performance with respect to mortgage loans serviced for others, including delinquency ratios.

The Seller also agrees to allow access to knowledgeable financial, accounting, origination and servicing officers of the Seller for the purpose of answering questions asked by any prospective purchaser regarding recent developments affecting the Seller, its loan origination or servicing practices or the financial statements of the Seller.

## SECTION 18. Mandatory Delivery; Grant of Security Interest.

The sale and delivery of each Mortgage Loan on or before the related Closing Date is mandatory from and after the date of the execution of the related Commitment Letter, it being specifically understood and agreed that each Mortgage Loan is unique and identifiable on the date hereof and that an award of money damages would be insufficient to compensate the Initial Purchaser for the losses and damages incurred by the Initial Purchaser (including damages to prospective purchasers of the Mortgage Loans) in the event of the Seller's failure to deliver each of the related Mortgage Loans or one or more Mortgage Loans otherwise acceptable to the Initial Purchaser on or before the related Closing Date. The Seller hereby grants to the Initial Purchaser a lien on and a continuing security interest in each Mortgage Loan and each document and instrument evidencing each such Mortgage Loan to secure the performance by the Seller of its obligation hereunder, and the Seller agrees that it holds such Mortgage Loans in custody for the Initial Purchaser subject to the Initial Purchaser's (i) right to reject any Mortgage Loan under the terms of this Agreement and the related Commitment Letter, and (ii) obligation to pay the related Purchase Price for the Mortgage Loans. All rights and remedies of the Purchaser under this Agreement are distinct from, and cumulative with, any other rights or remedies under this Agreement or afforded by law or equity and all such rights and remedies may be exercised concurrently, independently or successively.

SECTION 19. Notices. All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, return receipt requested, or, if by other means, when received by the other party at the address as follows:

(i) if to the Purchaser:
DB Structured Products, Inc.
60 Wall Street
New York, New York 10005
Attn: Michael Commaroto

(ii) if to the Seller:

Imperial Lending LLC
425 North Wilcox Street
Castle Rock, Colorado 80104
Attn: Larry Jaeger

or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

SECTION 20. Severability Clause.

Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to develop a structure the economic effect of which is nearly as possible the same as the economic effect of this Agreement without regard to such invalidity.

SECTION 21. Counterparts.

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

SECTION 22. Governing Law.

-43-

The Agreement shall be construed in accordance with the laws of the State of New York without regard to any conflicts of law provisions and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York, except to the extent preempted by Federal law.

SECTION 23. Intention of the Parties.

It is the intention of the parties that the Initial Purchaser is purchasing, and the Seller is selling, the Mortgage Loans and not a debt instrument of the Seller or another security. Accordingly, the parties hereto each intend to treat the transaction for Federal income tax purposes as a sale by the Seller, and a purchase by the Purchaser, of the Mortgage Loans. The Initial Purchaser shall have the right to review the Mortgage Loans and the related Mortgage Loan Files to determine the characteristics of the Mortgage Loans which shall affect the Federal income tax consequences of owning the Mortgage Loans and the Seller shall cooperate with all reasonable requests made by the Initial Purchaser in the course of such review. In the event, for any reason, any transaction contemplated herein is construed by any court or regulatory authority as a borrowing rather than as a sale, the Seller and the Purchaser intend that the Purchaser or its assignee, as the case may be, shall have a perfected first priority security interest in the Mortgage Loans, the servicing rights appurtenant to the Mortgage Loans, any funds related to the Mortgage Loans in an account in which the Seller deposits pursuant to Section 11(b) and the proceeds of any and all of the foregoing (collectively, the "Collateral"), free and clear of adverse claims. In such case, the Seller shall be deemed to have hereby granted to the Purchaser or its assignee, as the case may be, a first priority security interest in and lien upon the Collateral, free and clear of adverse claims. In such event, the related Commitment Letter and this Agreement shall constitute a security agreement, the Custodian shall be deemed to be an independent custodian for purposes of perfection of the security interest granted to the Purchaser or its assignee, as the case may be, and the Purchaser or its assignee, as the case may be, shall have all of the rights of a secured party under applicable law.

SECTION 24. Successors and Assigns.

This Agreement shall bind and inure to the benefit of and be enforceable by the Seller and the Purchaser and the respective successors and assigns of the Seller and the Purchaser. The Purchaser may assign this Agreement to any Person to whom any Mortgage Loan is transferred whether pursuant to a sale or financing and to any Person to whom the servicing or master servicing of any Mortgage Loan is sold or transferred. Upon any such assignment, the Person to whom such assignment is made shall succeed to all rights and obligations of the Purchaser under this Agreement to the extent of the related Mortgage Loan or Mortgage Loans and this Agreement, to the extent of the related Mortgage Loan or Loans, shall be deemed to be a separate and distinct Agreement between the Seller and such Purchaser, and a separate and distinct Agreement between the Seller and each other Purchaser to the extent of the other related Mortgage Loan or Loans. In the event that this Agreement is assigned to any Person to whom the servicing or master servicing of any Mortgage Loan is sold or transferred, the rights and benefits under this agreement which inure to the Purchaser shall inure to the benefit of both the Person to whom such Mortgage Loan is transferred and the Person to whom the servicing or master servicing of the Mortgage Loan has been transferred; provided that, the right to require a

-44-

Mortgage Loan to be repurchased by the Seller pursuant to Subsection 7.3 shall be retained solely by the Purchaser. This Agreement shall not be assigned, pledged or hypothecated by the Seller to a third party without the consent of the Purchaser.

## SECTION 25. Commitment Letter.

The terms and conditions set forth in the Commitment Letter with respect to each Closing Date shall be incorporated herein. In the event of any conflict between the terms of this Agreement and the related Commitment Letter, the Commitment Letter shall control.

## SECTION 26. Waivers.

No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

## SECTION 27. Exhibits.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

## SECTION 28. Nonsolicitation.

The Seller covenants and agrees that it shall not take any action to solicit the refinancing of any Mortgage Loan following the date hereof or provide information to any other entity to solicit the refinancing of any Mortgage Loan; provided that, the foregoing shall not preclude the Seller from engaging in solicitations to the general public by newspaper, radio, television or other media which are not directed toward the Mortgagors or from refinancing the Mortgage Loan of any Mortgagor who, without solicitation, contacts the Seller to request the refinancing of the related Mortgage Loan.

## SECTION 29. General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

      (a)    the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

      (b)    accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

      (c)    references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

-45-

(d)    reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)    the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)    the term "include" or "including" shall mean without limitation by reason of enumeration.

SECTION 30. Reproduction of Documents.

This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

SECTION 31. Further Agreements.

The Seller and the Purchaser each agree to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

SECTION 32.  Compliance with Regulation AB.

In addition to the Seller's obligations specified in this Agreement, the Seller shall cooperate fully with the Purchaser to provide any and all policies, statements, reports, records, files, certifications and any other information necessary in Purchaser's good faith determination to permit the Purchaser to comply with the provisions of Regulation AB under the Securities Act of 1933 and the Securities Exchange Act of 1934, as the same may be amended from time to time. The provisions set forth in the foregoing sentence shall survive the Closing Date and shall not merge with the closing documents, but instead shall be independently enforceable by the Purchaser.

[signature page to follow]

-46-

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

IMPERIAL LENDING LLC
(Seller)

By: _____

Name: _____

Title: _____

DB STRUCTURED PRODUCTS, INC.
(Initial Purchaser)

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____

-46-

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

IMPERIAL LENDING LLC
(Seller)

By:_____
Name:_____
Title:_____

DB STRUCTURED PRODUCTS, INC.
(Initial Purchaser)

By:_____       ROBERT LOPENA
Name:_____       AUTHORIZED SIGNATORY
Title:_____

By:_____
Name:_____       PETER PRINCIPATO
Title:_____       AUTHORIZED SIGNATORY

## EXHIBIT 1

### FORM OF SELLER'S OFFICER'S CERTIFICATE

I, _____, hereby certify that I am the duly elected _____ of Imperial Lending LLC, a Colorado limited liability company (the "Seller"), and further certify, on behalf of the Seller as follows:

1.    Attached hereto as Attachment I are a true and correct copy of the Certificate of Formation and operating agreement of the Seller as are in full force and effect on the date hereof.

2.    No proceedings looking toward merger, liquidation, dissolution or bankruptcy of the Seller are pending or contemplated.

3.    Each person who, as an officer or attorney-in-fact of the Seller, signed (a) the Master Mortgage Loan Purchase and Interim Servicing Agreement (the "Purchase Agreement"), dated as of September 1, 2005 by and between the Seller and DB Structured Products, Inc. (the "Purchaser"); (b) the Commitment Letter, dated July 6, 2005, between the Seller and the Purchaser (the "Commitment Letter"); and (c) any other document delivered prior hereto or on the date hereof in connection with the sale and servicing of the Mortgage Loans in accordance with the Purchase Agreement and the Commitment Letter was, at the respective times of such signing and delivery, and is as of the date hereof, duly elected or appointed, qualified and acting as such officer or attorney-in-fact, and the signatures of such persons appearing on such documents are their genuine signatures.

4.    Attached hereto as Attachment II is a true and correct copy of the resolutions duly adopted by the board of directors of the Seller on _____, 200_ (the "Resolutions") with respect to the authorization and approval of the sale and servicing of the Mortgage Loans; said Resolutions have not been amended, modified, annulled or revoked and are in full force and effect on the date hereof.

5.    Attached hereto as Attachment III is a Certificate of Good Standing of the Seller dated _____, 200_. No event has occurred since _____, 200_ which has affected the good standing of the Seller under the laws of the State of Colorado.

6.    Attached hereto as Attachment IV is a copy of each license of the Seller to originate and sell the Mortgage Loans. No such licenses have been suspended or revoked by any court, administrative agency, arbitrator or governmental body and no proceedings are pending which might result in such suspension or revocation.

7.      All of the representations and warranties of the Seller contained in Subsections 7.1 and 7.2 of the Purchase Agreement were true and correct in all material respects as of the date of the Purchase Agreement and are true and correct in all material respects as of the date hereof. .

8.      The Seller has performed all of its duties and has satisfied all the material conditions on its part to be performed or satisfied prior to the related Closing Date pursuant to the Purchase Agreement and the related Commitment Letter.

All capitalized terms used herein and not otherwise defined shall have the meaning assigned to them in the Purchase Agreement.

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of the Seller.

Dated:_____

       [Seal]

                          IMPERIAL LENDING LLC
                          (Seller)


                          By:_____
                          Name:_____
                          Title: Vice President


I, _____, Secretary of the Seller, hereby certify that _____ is the duly elected, qualified and acting Vice President of the Seller and that the signature appearing above is genuine.

IN WITNESS WHEREOF, I have hereunto signed my name.

Dated:_____

       [Seal]


                          IMPERIAL LENDING LLC
                          (Seller)

                          By:_____
                          Name:_____
                          Title: [Assistant] Secretary


[TPW: NYLEGAL:377052.2] 17988-00086 09/14/2005 10:53 AM

EXHIBIT 2

[RESERVED]

## EXHIBIT 3

### SECURITY RELEASE CERTIFICATION

I.     Release of Security Interest

_____, hereby relinquishes any and all right, title and interest it may have in and to the Mortgage Loans described in Exhibit A attached hereto upon purchase thereof by DB Structured Products, Inc. from the Seller named below pursuant to that certain Master Mortgage Loan Purchase and Interim Servicing Agreement, dated as of September 1, 2005, as of the date and time of receipt by _____ of $_____ for such Mortgage Loans (the "Date and Time of Sale"), and certifies that all notes, mortgages, assignments and other documents in its possession relating to such Mortgage Loans have been delivered and released to the Seller named below or its designees as of the Date and Time of Sale.

Name and Address of Financial Institution

(Name)

(Address)

By:_____

II.    Certification of Release

The Seller named below hereby certifies to DB Structured Products, Inc. that, as of the Date and Time of Sale of the above mentioned Mortgage Loans to DB Structured Products, Inc., the security interests in the Mortgage Loans released by the above named corporation comprise all security interests relating to or affecting any and all such Mortgage Loans. The Seller warrants that, as of such time, there are and will be no other security interests affecting any or all of such Mortgage Loans.

IMPERIAL LENDING LLC
Seller

By:_____
Name:_____
Title:_____

## EXHIBIT 4

### ASSIGNMENT AND CONVEYANCE

On this _____ day of _____, 200_, Imperial Lending LLC (the "Seller"), as Seller under that certain Master Mortgage Loan Purchase and Interim Servicing Agreement, dated as of September 1, 2005 (the "Agreement"), does hereby sell, transfer, assign, set over and convey to DB Structured Products, Inc. as Purchaser under the Agreement, without recourse, but subject to the terms of the Agreement, all rights, title and interest of the Seller in and to the Mortgage Loans listed on the Mortgage Loan Schedule attached hereto as Schedule One, together with the related Mortgage Files and all rights and obligations arising under the documents contained therein. Pursuant to Subsection 6.3 of the Agreement, the Seller has delivered or shall deliver to the Custodian the Mortgage Loan Documents for each Mortgage Loan to be purchased and such other documents as set forth in the Agreement. The contents of each related Servicing File required to be retained by the Seller to service the Mortgage Loans pursuant to the Agreement and thus not delivered to the Purchaser are and shall be held in trust by the Seller for the benefit of the Purchaser as the owner thereof. The Seller's possession of any portion of each such Servicing File is at the will of the Purchaser for the sole purpose of facilitating servicing of the related Mortgage Loan pursuant to the Agreement, and such retention and possession by the Seller shall be in a custodial capacity only. The ownership of each Mortgage Note, Mortgage, and the contents of the Mortgage File and Servicing File is vested in the Purchaser and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or which come into the possession of the Seller shall immediately vest in the Purchaser and shall be retained and maintained, in trust, by the Seller at the will of the Purchaser in such custodial capacity only.

The Seller confirms to the Purchaser that the representations and warranties set forth in Subsections 7.1 and 7.2 of the Agreement and in the Commitment Letter, dated September 7, 2005, are true and correct as of the date hereof, and that all statements made in the Seller's Officer's Certificate and all attachments thereto remain complete, true and correct in all respects as of the date hereof.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement.

IMPERIAL LENDING LLC
(Seller)

By:_____
Name:_____
Title:_____

## EXHIBIT 5

### CONTENTS OF EACH MORTGAGE FILE

With respect to each Mortgage Loan, the Mortgage File shall include each of the following items, which shall be available for inspection by the Purchaser and which shall be retained by the Seller or delivered to the Custodian:

1. Mortgage Loan Documents.

2. Residential loan application.

3. Mortgage Loan closing statement.

4. Verification of employment and income, if required pursuant to the related Mortgage Loan's orientation program.

5. Verification of acceptable evidence of source and amount of downpayment, if required pursuant to the related Mortgage Loan's orientation program.

6. Credit report on Mortgagor.

7. Residential appraisal report.

8. Photograph of the Mortgaged Property.

9. Survey of the Mortgaged Property.

10. Copy of each instrument necessary to complete identification of any exception set forth in the exception schedule in the title policy, i.e., map or plat, restrictions, easements, sewer agreements, home association declarations, etc.

11. All required disclosure statements and statement of Mortgagor confirming receipt thereof.

12. If available, termite report, structural engineer's report, water potability and septic certification.

13. Sales Contract, if applicable.

14. Hazard insurance policy.

15. Tax receipts, insurance premium receipts, ledger sheets, payment history from date of origination, insurance claim files, correspondence, current and historical computerized data files, and all other processing, underwriting and closing papers and records which are customarily

5-2

contained in a mortgage loan file and which are required to document the Mortgage Loan or to service the Mortgage Loan.

16. Amortization schedule, if available.

17. Payment history for Mortgage Loans that have been closed for more than 90 days.

**EXHIBIT 5**

[RESERVED]

EXHIBIT 7

[RESERVED]

8-1

EXHIBIT 8

[RESERVED]

## EXHIBIT 9

### FORM OF COMMITMENT LETTER

**EXHIBIT 10**

## MORTGAGE LOAN DOCUMENTS

With respect to each Mortgage Loan set forth on a related Mortgage Loan Schedule, the Seller shall deliver and release to the Custodian the following documents:

1.     the original Mortgage Note bearing all intervening endorsements necessary to show a complete chain of endorsements from the original payee to the Seller, endorsed in blank, "Pay to the order of _____, without recourse", and, if previously endorsed, signed in the name of the last endorsee by a duly qualified officer of the last endorsee. If the Mortgage Loan was acquired by the last endorsee in a merger, the endorsement must be by "[name of last endorsee], successor by merger to [name of predecessor]". If the Mortgage Loan was acquired or originated by the last endorsee while doing business under another name, the endorsement must be by "[name of last endorsee], formerly known as [previous name]";

If the Seller uses facsimile signatures to endorse Mortgage Notes, the Seller must provide in an Officer's Certificate that the endorsement is valid and enforceable in the jurisdiction(s) in which the Mortgaged Properties are located and must retain in its corporate records the following specific documentation authorizing the use of facsimile signatures: (i) a resolution from its board of directors authorizing specific officers to use facsimile signatures; stating that facsimile signatures will be a valid and binding act on the Seller's part; and authorizing the Seller's corporate secretary to certify the validity of the resolution, the names of the officers authorized to execute documents by using facsimile signatures, and the authenticity of specimen forms of facsimile signatures; (ii) the corporate secretary's certification of the authenticity and validity of the board of directors' resolution; and (iii) a notarized "certification of facsimile signature," which includes both the facsimile and the original signatures of the signing officer(s) and each officer's certification that the facsimile is a true and correct copy of his or her original signature.

2.     in the case of a Mortgage Loan that is not a MERS Mortgage Loan, the original Assignment of Mortgage for each Mortgage Loan, in form and substance acceptable for recording. The Mortgage shall be assigned, with assignee's name left blank. If the Mortgage Loan was acquired by the last assignee in a merger, the Assignment of Mortgage must be made by "[name of last assignee], successor by merger to [name of predecessor]". If the Mortgage Loan was acquired or originated by the last assignee while doing business under another name, the Assignment of Mortgage must be by "[name of last assignee], formerly known as [previous name]";

3.     the original of any guarantee executed in connection with the Mortgage Note, if any;

4.     for each Mortgage Loan that is not a MERS Mortgage Loan, the original Mortgage with evidence of recording thereon or, if the original Mortgage with evidence of

recording thereon has not been returned by the public recording office where such Mortgage has been delivered for recordation or such Mortgage has been lost or such public recording office retains the original recorded Mortgage, a photocopy of such Mortgage, together with (i) in the case of a delay caused by the public recording office, an Officer's Certificate of the title insurer insuring the Mortgage stating that such Mortgage has been delivered to the appropriate public recording office for recordation and that the original recorded Mortgage or a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage will be promptly delivered to the Custodian upon receipt thereof by the party delivering the Officer's Certificate or by the Seller; or (ii) in the case of a Mortgage where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage with the recording information thereon certified by such public recording office to be a true and complete copy of the original recorded Mortgage;

5.    for each Mortgage Loan that is a MERS Mortgage Loan, the original Mortgage, noting the presence of the MIN of the Mortgage Loan and either language indicating that the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded;

6.    the originals of all assumption, modification, consolidation or extension agreements, with evidence of recording thereon, if any;

7.    the originals of all intervening assignments of mortgage with evidence of recording thereon evidencing a complete chain of ownership from the originator of the Mortgage Loan to the last assignee, or if any such intervening assignment of mortgage has not been returned from the applicable public recording office or has been lost or if such public recording office retains the original recorded intervening assignments of mortgage, a photocopy of such intervening assignment of mortgage, together with (i) in the case of a delay caused by the public recording office, an Officer's Certificate of the title insurer insuring the Mortgage stating that such intervening assignment of mortgage has been delivered to the appropriate public recording office for recordation and that such original recorded intervening assignment of mortgage or a copy of such intervening assignment of mortgage certified by the appropriate public recording office to be a true and complete copy of the original recorded intervening assignment of mortgage will be promptly delivered to the Custodian upon receipt thereof by the party delivering the Officer's Certificate or by the Seller; or (ii) in the case of an intervening assignment of mortgage where a public recording office retains the original recorded intervening assignment of mortgage or in the case where an intervening assignment of mortgage is lost after recordation in a public recording office, a copy of such intervening assignment of mortgage with recording information thereon certified by such public recording office to be a true and complete copy of the original recorded intervening assignment of mortgage;

8.    if the Mortgage Note, the Mortgage, any Assignment of Mortgage, or any other related document has been signed by a Person on behalf of the Mortgagor, the original power of attorney or other instrument that authorized and empowered such Person to sign;

9.    the original lender's title insurance policy in the form of an ALTA mortgage title insurance policy, containing each of the endorsements required by FNMA and insuring the Purchaser and its successors and assigns as to the first or second priority lien of the Mortgage in the original principal amount of the Mortgage Loan or, if the original lender's title insurance policy has not been issued, the irrevocable commitment to issue the same; and

10.    the original of any security agreement, chattel mortgage or equivalent document executed in connection with the Mortgage, if any.

## EXHIBIT 11

## FORM OF MONTHLY SERVICER'S REPORT

| Field | Description |
|---|---|
| SERVICER_LOANID | Servicer loan number. |
| SELLER_LOANID | Seller loan number. |
| LNAME | Last name of borrower. |
| FNAME | First name of borrower. |
| DATE_TRADE_FUND | Date of loan's funding with DB, i.e. date that Deutsche Bank bought the loan from the seller. |
| INTEREST_RATE | Gross interest rate on loan as of end of month being reported. |
| NET_INTEREST_RATE | Net interest rate on loan as of end of month being reported. |
| PRIN_INT_PYMT | Principal & Interest on loan as of end of month being reported. |
| LIEN | Lien of the loan. |
| IO_FLAG | Optional: Y/N flag for Interest-Only loans (when applicable). |
| BEG_UPB_ACT | Beginning actual balance. |
| BEG_UPB_SCH | Beginning scheduled balance |
| END_UPB_ACT | Ending actual balance. |
| END_UPB_SCH | Ending scheduled balance. |
| PAID_THRU_DATE | Paid through date of the loan. |
| NEXT_DUE_DATE | Next due date of the loan at end of month being reported. |
| DAYS_DELQ | Days delinquent at end of month being reported. |
| PIF_DATE | Payoff date. |
| PRIN_AMT_ACT | Actual collected principal remitted to DB. |
| PRIN_AMT_SCH | Scheduled principal remitted to DB. |
| CURTAILMENT | Curtailment remitted to DB. |
| INT_AMT_ACT | Actual collected interest remitted to DB. |
| INT_AMT_SCH | Scheduled interest remitted to DB. |
| PREPAY_PENALTY_AMT | Prepayment Penalty remitted to DB. |
| SERVICE_FEE | Service fee charged per loan for the month being reported. |
| STATUS | Status of loan as of end of month being reported; "BKCY" = loan is in bankruptcy (chapter given by "BKCY_CHAPTER" field; "FBRE" = loan is on a forbearance plan; "FCLS" = loan is in foreclosure; "REO" = loan is in REO. |
| BKCY_CHAPTER | Bankruptcy chapter filed. |
| BKCY_START_DATE | Bankruptcy start date. |
| BKCY_END_DATE | Bankruptcy end date. |
| FCLS_START_DATE | Foreclosure start date. |
| FCLS_END_DATE | Foreclosure end date. |
| FB_START_DATE | Forbearance start date. |
| FB_END_DATE | Forbearance end date. |
| REO_TRANSFER_DATE | REO transfer date. |
| MISC_ADJ1 | Loan level breakdown of any miscellaneous adjustment. |
| COMMENT1 | Comment describing nature of misc_adj1. |
| MISC_ADJ2 | Loan level breakdown of any miscellaneous adjustment. |
| COMMENT2 | Comment describing nature of misc_adj2. |
| MISC_ADJ3 | Loan level breakdown of any miscellaneous adjustment. |
| COMMENT3 | Comment describing nature of misc_adj3. |
| TOT_REMIT | Loan level total amount remitted to DB. |

Deutsche Bank Wire Instructions

| | |
|---|---|
| Calculation to | 4/17/2007 |
| # of Loans | 13 |
| Scheduled UPB | 5,594,501.00 |
| Premium | 37,513.45 |
| Accrued Interest | 124,583.73 |
| Chgs & Escrow | 12,148.61 |

| | |
|---|---|
| Bank: | Bank of New York |
| ABA#: | 021-000-018 |
| Acct#: | GLA 111569 |
| Beneficiary: | DPX |
| Attn: | Daniel H. Kim |
| Ref: | Imperial Repo |

Per diem based upon Current Value:   222/30.73

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SCL005K0 | | | | | | | | | | | | | 176,209.91 |
| SCL004AZ | 1176721 | MARTINEZ,LELA | 150,010.00 | 4/1/2005 | 5/1/2005 | 2/28/2005 | 11.49 | 356 | 65.00 | 17,697.29 | 102.5500% | 3,834.28 | 2,652.00 | 2,027.24 | 191,662.50 |
| SCL018STX | 1147179 | SMITH,JARED | 171,124.00 | 7/1/2005 | 6/1/2005 | 12/14/2005 | 10.99 | 336 | 52.24 | 17,030.36 | 102.5500% | 3,508.04 | | | 240,230.65 |
| SCL038RW | 1152330 | JOHNSON,LARRY | 227,257.03 | 10/1/2005 | 9/1/2005 | 12/14/2005 | 10.99 | 216 | 69.38 | 16,372.36 | 100.0000% | 4,688.77 | | | 83,323.49 |
| SCL061STX | 1143125 | TAYLOR,AINE | 86,477.00 | 11/1/2005 | 10/1/2005 | 12/14/2005 | 10.99 | 205 | 26.49 | 5,433.30 | 100.2375% | 2,012.73 | | 652.27 | 143,710.23 |
| SCL026RW | 1126999 | ASHLEY,SCOTT | 122,312.50 | 2/1/2006 | 1/1/2006 | 2/17/2006 | 10.99 | 476 | 37.24 | 17,779.43 | 102.0087% | 2,086.74 | 2,007.24 | 1,599.27 | 107,358.72 |
| SCL017PN | 1124914 | MGDDE,DAVID | 87,469.00 | 1/1/2006 | 12/1/2005 | 1/17/2006 | 10.99 | 506 | 26.09 | 13,511.19 | 101.6000% | 2,198.72 | 3,352.99 | 2,044.79 | 236,369.87 |
| SCL005TX | 1127007 | SILVA, EDWARD | 155,350.00 | 1/1/2006 | 12/1/2005 | 11/22/2005 | 10.99 | 506 | 53.61 | 30,265.42 | 102.1000% | 4,010.57 | | | 83,172.49 |
| SCL052VAZ | 1141373 | CRUFHN,LISA | 22,366.00 | 6/1/2006 | 5/1/2006 | 12/14/2005 | 10.99 | 356 | 12.40 | 7,973.34 | 102.5500% | 1,534.16 | 748.58 | 3,528.69 | 176,845.83 |
| SCL319AMO | 1146174 | SZYT,MICHAEL | 147,000.00 | 1/1/2006 | 12/1/2005 | 12/14/2005 | 11.99 | 566 | 44.68 | 22,700.17 | 101.6067% | 3,013.60 | 1,235.00 | 2,182.15 | 119,419.27 |
| SCL065NV | 1152619 | JEFFERSON,MAURICE | 26,600.00 | 2/1/2006 | 1/1/2006 | 12/28/2005 | 10.99 | 476 | 29.49 | 14,227.16 | 102.5900% | 2,416.20 | 2,097.99 | 1,221.92 | 379,310.51 |
| SCL213DAO | 1146198 | GOODS,MICHAEL | 339,132.50 | 6/1/2006 | 5/1/2006 | 2/17/2006 | 10.99 | 356 | 103.53 | 34,856.60 | 100.0000% | 0.00 | 2,810.40 | 2,171.32 | 167,991.55 |
| SCL019VA | 1152813 | GUASTAFERRO,JENN | 132,950.00 | 3/1/2006 | 2/1/2006 | 2/14/2006 | 11.49 | 666 | 41.13 | 18,633.62 | 107.4400% | 3,760.24 | | | 161,737.29 |
| SCL055BNV | 1176721 | MACCORRIGHAN | 256,501.00 | 12/1/2006 | 6/1/2006 | 2/21/2005 | 11.49 | 196 | 49.95 | 7,234.04 | 120.2500% | 3,913.26 | | | |
| | | | 1,594,501.00 | | | | | | 611.51 | 224,597.22 | | 37,513.45 | 15,968.11 | 18,179.50 | 2,279,116.59 |

Exhibit 3



Thacher Proffitt & Wood LLP
Two World Financial Center
New York, NY 10281
212.912.7400

Fax: 212.912.7751
www.tpw.com

April 27, 2007

<u>By Federal Express and Certified Mail – Return Receipt Requested</u>

Mr. Larry Jaeger
Imperial Lending LLC
425 North Wilcox Street
Castle Rock, CO 80104

Re:     Master Mortgage Loan Purchase and Interim Servicing Agreement
dated as of September 1, 2005 between DB Structured Products,
Inc. and Imperial Lending LLC ("Imperial")

Dear Mr. Jaeger:

Our firm has been retained as litigation counsel by DB Structured Products, Inc. ("DBSP") in connection with the Master Mortgage Loan Purchase and Interim Servicing Agreement dated as of September 1, 2005 ("Agreement") between DBSP and Imperial, and in connection with certain letter agreements between DBSP and Imperial (the "Commitment Letters", and together with the Agreement, the "Agreements"). Capitalized terms used herein and not defined have the meanings set forth in the Agreements.

DBSP hereby demands immediate payment of the amount of $2,279,145.99 (the "Repurchase Price") which is due and owing to DBSP by Imperial in connection with Imperial's obligation to repurchase the mortgage loans listed on Exhibit A attached hereto (the "Mortgage Loans") pursuant to the Agreements. The Mortgage Loans are in early payment default, as specifically set forth in the Commitment Letters.

Please remit the Repurchase Price by wire transfer to the following bank account no later than May 10, 2007:

Bank:          Bank of New York
ABA:           021000018
Acct. #:       GLA/111569
Acct. Name:    DPX
Attn.:         Daniel H. Kim
Re:            Imperial Repurchase

Mr. Larry Jaeger                                                    Page 2.
April 27, 2007

   If you fail to remit the Repurchase Price by that date, please be advised that DBSP will commence formal legal action against Imperial to recover the amounts owed without further notice.

   Nothing contained in this letter shall constitute a waiver of any of DBSP's rights or remedies under the Agreements, at law or in equity. Nor shall this letter be construed as a waiver of any Event of Default by Imperial under the Agreements.

   Please call me or Steven Paolini, Esq., Vice President and Counsel, Deutsche Bank AG, at (212) 250-0382 should you have any questions or wish to discuss this matter.


                                   Very truly yours,


                                   John P. Doherty


cc:    Steven Paolini, Esq.


Encl.

Deutsche Bank Wire Instructions:

| Bank: | Bank of New York |
| ABA#: | 021000018 |
| Acct#: | GLA 111569 |
| Beneficiary: | DFX |
| Attn: | Donald H. Kim |
| Ref: | Ingersoll Rope |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 11152050 JOHNSON LARRY | | 10/1/2005 | 1/31/2006 | 10.99 | 225 | 69.33 | 16,572.86 | 182.0500% | 4,663.77 | 248,265.65 |
| 11141725 BAYLDRAINE | | 11/1/2005 | 10/31/2006 | 10.99 | 205 | 26.40 | 5,433.13 | 102.3075% | 2,012.70 | 93,543.06 |
| 11024699 ASHLEY, SCOTT | | 2/1/2006 | 2/7/2006 | 10.99 | 47% | 37.24 | 17,773.43 | 104.4382% | 2,039.74 | 143,770.23 |

# EXHIBIT B

B 151 — Affidavit of Service of Summons or Subpoena: Personal or Alternative Methods (Corporate and Military Service) 10 pt type 2-95                                        © 1988 JULIUS BLUMBERG, INC. PUBLISHER NYC-10013

| COURT | UNITED STATES DISTRICT COURT |
|---|---|
| COUNTY OF | SOUTHERN DISTRICT OF NEW YORK |

DB STRUCTURED PRODUCTS, INC.

                                                          *Plaintiff(s)*

                        *against*

IMPERIAL LENDING LLC

                                                          *Defendant(s)*

Index No. 07 CV 4105

**AFFIDAVIT OF
SERVICE OF SUMMONS
(AND COMPLAINT)
SEE ATTACHED RIDER**

**COLORADO**
STATE OF NEW YORK, COUNTY OF  JEFFERSON      SS.:  The undersigned, being duly sworn, deposes and says; deponent is not a party herein, is over 18 years of age and resides at  8888 W. Belleview Ave. # Ste, Littleton, CO 80123
That on  6/5/07                   at 12:52 P.M., at 6400 S. FIDDLERS GREEN CR., GREENWOOD, CO
deponent served the within summons, and complaint on  IMPERIAL LENDING, LLC                         defendant therein named.
SEE ATTACHED RIDER                    BY SERVING REGISTERED AGENT
                                       HERRICK K. LIDSTONE, JR.

**INDIVIDUAL**
1. ☒  by delivering a true copy of each to said defendant personally; deponent knew the person so served to be the person described as said defendant therein.

**CORPORATION**
2. ☐  a                      corporation, by delivering thereat a true copy of each to
personally, deponent knew said corporation so served to be the corporation described in said summons as said defendant and knew said individual to be                                              thereof.

**SUITABLE AGE PERSON**
3. ☐  by delivering thereat a true copy of each to                                        a person of suitable age
and discretion. Said premises is defendant's—actual place of business—dwelling place—usual place of abode—within the state.

**AFFIXING TO DOOR, ETC.**
4. ☐  by affixing a true copy of each to the door of said premises, which is defendant's—actual place of business—dwelling place—usual place of abode—within the state. Deponent was unable, with due diligence to find defendant or a person of suitable age and discretion thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4**
5. ☐  Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to defendant at defendant's last known residence, at                        and deposited said envelope in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4**
6. ☐  Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly addressed to defendant at defendant's actual place of business, at
in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the defendant.

**DESCRIPTION USE WITH 1, 2, OR 3**
☒

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ Male | ☒ White Skin | ☐ Black Hair | ☒ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☐ Female | ☐ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100-130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☒ 36-50 Yrs. | ☐ 5'4"-5'8" | ☐ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☐ 51-65 Yrs. | ☒ 5'9"-6'0" | ☒ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☒ Glasses | ☐ Over 65 Yrs. | ☐ Over 6' | ☐ Over 200 Lbs. |

Other identifying features:

**USE IN NYC CIVIL CT.**
☐  The words "CONSUMER CREDIT TRANSACTION" were prominently displayed at the top of the summons(es) and the additional legend was printed in not less than 12 point bold upper case type on the summons(es) pursuant to 22 NYCRR §208.6(d) and (f).

**MILITARY SERVICE**
☐  I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. Recipient wore ordinary civilian clothes and no military uniform. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on    6/6/09

_(signature)_

**LYNNE A. GRIMES
NOTARY PUBLIC
STATE OF COLORADO**

_(signature)_
NICHOLAS MARTINEZ

License No. N/A

INSTRUCTIONS: Check appropriate boxes and fill in blanks. Delete inappropriate italicized language and military service allegation if not applicable.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X    Case No.
                                                             07 CV 4105
DB STRUCTURED PRODUCTS, INC.

                                     Plaintiff,             RIDER TO
                                                            AFFIDAVIT OF
              vs.                                           SERVICE

IMPERIAL LENDING LLC

                                     Defendants.

-------------------------------------------------------X

List Of Documents Served:

- Summons In A Civil Case

- Complaint With Exhibits 1-3

- Explanation Of Relatedness

- Statement Pursuant To Rule 7.1 Of The Federal Rules Of Civil
  Procedure

- Civil Cover Sheet

- Individual Practices In Civil Cases Denise Cote, United States District
  Judge

- Individual Rules Of Practice Of Judge Kevin Nathaniel Fox

- Procedures For Electronic Case Filing

- Guidelines For Electronic Case Filing

- 3rd Amended Instructions For Filing An Electronic Case Or Appeal

AO 440 (Rev. 10/93) Summons in a Civil Action – SDNY WEB 4/99

# United States District Court

SOUTHERN _____ DISTRICT OF _____ NEW YORK

DB STRUCTURED PRODUCTS, INC.

**SUMMONS IN A CIVIL CASE**

V.

CASE NUMBER:

IMPERIAL LENDING LLC

# 07 CV 4105

TO: (Name and address of defendant)

IMPERIAL LENDING LLC
426 North Wilcox Street
Castle Rock, CO 80104

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

THACHER PROFFITT & WOOD LLP
Richard F. Hans (RH-0110)
John P. Doherty (JD-3275)

Two World Financial Center
New York, New York 10281
(212) 912-7400

an answer to the complaint which is herewith served upon you, within _____ **TWENTY** _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

CLERK

(BY) DEPUTY CLERK

DATE    MAY 2 5 2007

AO 440 (Rev. 10/93)  Summons in a Civil Action -SDNY  WEB 4/99

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and Complaint was made by me[1] | |
| NAME OF SERVER (PRINT) | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant.  Place where served: _____
_____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.
Name of person with whom the summons and complaint were left: _____
_____

☐ Returned unexecuted: _____
_____
_____

☐ Other (specify): _____
_____
_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing
information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
Date                                      Signature of Server

_____
Address of Server

_____

(1)    As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

**Service of Process:**
1:07-cv-04105-UA DB Structured Products, Inc. v. Imperial Lending LLC
ECF, REFERRED

### U.S. District Court

### United States District Court for the Southern District of New York

### Notice of Electronic Filing

The following transaction was entered by Zahner, Brendan on 6/13/2007 at 4:27 PM EDT and filed on 6/13/2007
Case Name:        DB Structured Products, Inc. v. Imperial Lending LLC
Case Number:      1:07-cv-4105
Filer:            DB Structured Products, Inc.
Document Number: 4

**Docket Text:**
SUMMONS RETURNED EXECUTED Summons and Complaint served. Imperial Lending LLC served on 6/5/2007, answer due 6/25/2007. Service was accepted by Herrick K. Lidstone, Jr., Registered Agent for Imperial Lending LLC. Document filed by DB Structured Products, Inc.. (Zahner, Brendan)

**1:07-cv-4105 Notice has been electronically mailed to:**

John Patrick Doherty    jdoherty@tpw.com

Richard Francis Hans , Jr    rhans@tpw.com

Brendan Ernest Zahner    bzahner@tpw.com, mmuller@tpw.com

**1:07-cv-4105 Notice has been delivered by other means to:**

Kerry Ford Cunningham
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, NY 10036

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1008691343 [Date=6/13/2007] [FileNumber=3467204-0
] [02fa6160930c210bcbfef978a0b2ee02e39aa6b5109674f7e6d3e5976a85f1a97d7
9d96089a86e48961e1e444ff76bcb0b11f7ec56eec52de377888421e75d3c]]

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DB STRUCTURED PRODUCTS, INC.

Plaintiff,

-against-

IMPERIAL LENDING LLC

Defendant.

**ECF CASE**

**07 Civ. 4105 (GBD)**

**CLERK'S CERTIFICATE**

I, J. MICHAEL MCMAHON, Clerk of the United States District Court for the Southern District of New York, do hereby certify that this action commenced on May 25, 2007 with the filing of a Complaint; a copy of the Summons and Complaint was served on Defendant Imperial Lending LLC on June 5, 2007 by serving Defendant's registered agent, Herrick K. Lidstone, Jr.; and proof of such service was filed on June 13, 2007.

I further certify that the docket entries indicate that the Defendant has not filed an answer or otherwise moved with respect to the Complaint herein. The default of the Defendant is hereby noted.

Dated:  New York, New York

Aug 8, 2008

J. MICHAEL MCMAHON
Clerk of the Court

By: _____
Deputy Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DB STRUCTURED PRODUCTS, INC.

                    Plaintiff,

              -against-


IMPERIAL LENDING LLC

                    Defendant.

ECF CASE

07 Civ. 4105 (GBD)

**AFFIDAVIT OF JOHN P.
DOHERTY IN SUPPORT OF
REQUEST FOR CERTIFICATE
OF DEFAULT**

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NEW YORK         )

John P. Doherty, being duly sworn, deposes and says:

1.    I am an attorney admitted to practice in the State of New York and a member of THACHER PROFFITT & WOOD LLP, attorneys for Plaintiff, DB Structured Products, Inc. ("Plaintiff") in the above-captioned matter.

2.    I submit this affidavit in support of Plaintiff's application for a Default Judgment against Imperial Lending LLC ("Defendant" and together with Plaintiff, the "Parties").

3.    On May 25, 2007 the above-captioned action ("Action") was commenced with the filing of the Complaint.

4.    On June 5, 2007, a copy of the Summons and Complaint was properly served on Defendant by personally serving Defendant's registered agent, Herrick K. Lidstone, Jr. Proof of such service was filed with the Clerk on June 13, 2007.

5.    Defendant has failed to plead or otherwise defend this Action.

6.    The Parties had previously entered into stipulations, so-ordered by the Court, extending the time by which Defendant was required to answer or otherwise move against the Complaint. The last such stipulation was entered by the Court on September 25, 2007 and provided that Defendant's time to answer or otherwise move against the Complaint was extended to and including October 26, 2007.

7.    The time within which Defendant was permitted to file an answer to the Complaint or otherwise move has now expired and has not been extended.

8.    Defendant is not an infant, in the military, or an incompetent person.

By: _____
JOHN P. DOHERTY

Sworn to before me this
7ᵗʰ day of August, 2008

_____
Notary Public

CHRISTOPHER A. LYNCH
Notary Public, State of New York
No. 02LY6151697
Qualified in Queens County
Commission Expires Aug. 21, 2010

2

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DB STRUCTURED PRODUCTS, INC.

                        Plaintiff,                     **ECF CASE**

            -against-                                  **07 Civ. 4105 (GBD)**

                                                       **STATEMENT OF DAMAGES**

IMPERIAL LENDING LLC

                        Defendant.

Principal amount sued for ...................................................................$2,279,145.99

Interest at $611.91 per diem from 04/27/07 through 08/08/08 (469 days)....... $ 286,985.79

Attorneys' fees and costs....................................................................$  18,138.85

Total (as of August 8, 2008)...............................................................$2,584,270.63

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DB STRUCTURED PRODUCTS, INC.

Plaintiff,

-against-

IMPERIAL LENDING LLC

Defendant.

ECF CASE

07 Civ. 4105 (GBD)

## DEFAULT JUDGMENT

This action having been commenced on May 25, 2007 by the filing of the Complaint, and a copy of the Summons and Complaint being properly served on Defendant on June 5, 2007 by personally serving Defendant's registered agent, Herrick K. Lidstone, Jr., and a proof of service having been filed with the Clerk of the Court on June 13, 2007 and the Defendant not having answered the Complaint, and the time for answering the Complaint having expired, it is

**ORDERED** that Plaintiff have judgment against Defendant in the liquidated amount of $2,279,145.99 with interest at $611.91 per diem from 04/27/07 through 08/08/08 amounting to $286,985.79, and attorneys' fees and costs in the amount of $18,138.85, amounting in all to $2,584,270.63; and it is further

**ORDERED** that within thirty (30) days following payment in full of the amount awarded by this Default Judgment, Plaintiff shall return to Defendant the Mortgage Loans[1] as set forth in the Purchase Agreement.

Dated: New York, New York

_____

_____
**United States District Judge**

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Complaint.